# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY, AND THE PREROGATIVE COURT.

### NOVEMBER TERM, 1902.

ALFRED H. RYAN, appellant,

*v.*

ISABELLE C. WILSON et al., executors, respondents.

[Filed January 9th, 1903.]

When executors or administrators, in accordance with section 85 of the Orphans Court act (*P. L. of 1898 p. 715*), report a sale to the orphans court for confirmation, the court should withhold confirmation and order a resale, if the bid reported is far below the estimated value of the property and the property was not offered for sale in a manner which, in view of all the known circumstances, seemed likely to bring the best price.

On appeal from a decree of the prerogative court, advised by Vice-Ordinary Reed, who delivered the following conclusions:

On January 24th, 1902, the estate of Samuel K. Wilson, deceased, was, by the orphans court of Mercer county, decreed to be insolvent. Under the authority of section 107 of the Orphans Court act (*P. L. of 1898 p. 755*) the court directed the executors of Samuel K. Wilson to make sale of certain property of the estate. On March 19th following, by virtue of this order, two mills, one situated on Factory street and the other on Fair street, in the city of Trenton, were sold together at public sale to Alfred H. Ryan for the sum of $30,300, subject to mortgages amounting to $8,631.09.

Objections to the confirmation of this sale were interposed by the creditors of the insolvent estate. On May 9th the orphans court made an order that the sale be disapproved and that the executors resell the property. The present appeal brings up this order.

The petition which challenges the propriety of the sale raises three grounds of complaint—*first,* inadequacy of price; *second,* that the machinery should have been offered apart from the lands and buildings, and *third,* that the purchaser induced another prospective bidder to forbear from bidding.

I will notice the third ground of complaint before alluding to the others.

There is in the case the testimony of Mr. Lamb to the effect that Mr. Ryan requested him not to bid upon the joint properties when they were struck off to Mr. Ryan. Mr. Ryan denies this statement.

The circumstances in which the sale was made must be briefly stated. The two properties were exposed for tentative bidding in three methods for the purpose of ascertaining which of the three schemes would produce the most money. By the first of these methods the Fair street property and the Factory street property were put up separately, each equipped with machinery as it stood—the Fair street property firstly, and the Factory street property secondly. The highest bid for the former was Ryan's

Ryan *v.* Wilson.

offer of $21,400, and the highest bid for the factory street property was Lamb's offer of $8,800.

By the second method, the Fair street property, which needed, to complete its equipment, ten pieces of broad-finishing machinery, which were in the Factory street mill, was offered together with the ten pieces of finishing machinery; then the Factory street property was separately offered, less the ten pieces of finishing machinery just mentioned. For the former, Ryan bid $21,600 and for the latter, Lamb bid $8,500.

Then, thirdly, both properties were offered together as they stood, and the highest bid was Ryan's, of $30,300.

The aggregate amount of the two bids under the first scheme was $30,200, and of the two bids under the second scheme, $30,100; therefore, Ryan's bid, under the third scheme, of $30,300, was accepted.

It was in respect to the last sale that Lamb says he was requested by Ryan to refrain from bidding. It is apparent from the order of the bidding, as well as from the testimony of both Lamb and Ryan, that Lamb wished the Factory street property and that Ryan desired the Fair street property; but Ryan also wished to have with the latter the ten pieces of finishing machinery, then in the Factory street property, to complete the equipment of the Fair street mill. Had Lamb, when the Factory street property was offered the second time, bid more than $8,600, the aggregate amount of his and Ryan's bids would have been in excess of the aggregate amount of the two bids under the first scheme; and so Ryan would not have wished to buy both properties for the purpose of getting the ten pieces of finishing machinery. After he had made his bid on the Fair street property, with the ten pieces of machinery, he wished Lamb to bid enough for the Factory street property, when it was put up the second time, without the ten pieces, to make their aggregate bids more than the bids under the first scheme.

While the bidding upon the property was progressing at this time, Ryan says he went over to Lamb, who was sitting on a counter about ten feet away, and urged him to bid the property up, saying it was worth the amount he had first bid without the

ten pieces, and that Lamb declined to increase his bid. Ryan denies that he thereafter, during the sale, spoke to Lamb.

Mr. Lamb's account of what occurred is that the two mills were put up, including the broad-finishing machinery in the Factory street mill. After the Factory street mill was knocked down on his bid of $8,900, Mr. Ryan said he would like to have this machinery. He said:

"I want this machinery and I won't disturb you. You get your mill at your bid and I will take this lower mill and this broad-finishing machinery."

Lamb said, "All right; that is satisfactory." Then the two mills were put up together, and Ryan came over to Lamb again and said:

"Now don't bid on this and I will just make a bid on it, and you will get your upper mill, less the broad-finishing machinery, and it is understood, and we will fix this matter up afterward."

So it was knocked, and he said "he would make a bid of $50; something like that." "I said, make it $100; you have got lots of money."

Mr. Ryan admits that Mr. Lamb told him to bid $100 when the properties were up jointly the last time, but he says he was not near Lamb, and that Lamb said in a very sarcastic way, "As you have all the money there is in this crowd, why not make it $100?" "I am quick tempered, and I said make it $100." Mr. Ryan gave his check for ten per cent. of the purchase-money. He says that a Mr. Brown and he started for the train, and Mr. Lamb came to him and said: "Let me give you a check for that upper mill," to which Ryan replied: "All bills are paid," and passed on.

The sale was made on March 19th, and Lamb wrote a letter to Ryan, which is not produced, which elicited a reply from Ryan, dated March 21st, in these words:

"I cannot receive any check from anybody until I get the deeds. I think you are wrong as regards 'counsel.' I will work the newspapers. Robbins and Stokes are anxious to get it off their hands and will help me."

After receiving this letter, Lamb went to Somerville to see Ryan, when Ryan refused to recognize any interest of Lamb in the mills, which provoked a quarrel, ending in Ryan ordering Lamb to leave his office.

It is thus perceived that the accounts of Lamb and Ryan radically differ in regard to what occurred at the time of the sale and the number of times they conversed—Ryan insisting that he crossed to speak with Lamb but once, and Lamb saying that Ryan came over to him two or three times.

Mr. Goldstein says that at the time mentioned by Ryan he was standing close behind Lamb, who was sitting on a counter, and he saw Ryan step out of the ring where he was standing and come over to Lamb and speak to him. He says he heard the words, "Why don't you bid her up?" and nothing more. He says he did not hear Ryan afterward say anything to Lamb.

Mr. Brown says he stood right near Ryan at the sale, and that he saw Ryan step across to speak to Lamb, but he did not think it was when the two mills were up together, but thinks it was when they were selling the Fair street mill with the broad-finishing machinery. He does not recollect that Ryan left his side again.

In this condition of the testimony it is not proven to my satisfaction that Ryan did make a request that Lamb should refrain from bidding upon the property at the time that Ryan purchased. The testimony undoubtedly leaves the impression that something took place between Ryan and Lamb, by reason of which Lamb thought he was assured of the Factory street property at the supposed bid of $8,900 in the event of Ryan becoming the purchaser of the two properties. His offer to pay the commission at the sale, and his letter and visit to Ryan seems to show that he thought there was some such understanding.

Ryan's reply to Lamb's letter, while not exhibiting any specific acknowledgment that Lamb had an interest in the purchase, yet did not state that Lamb was a stranger to the purchase and therefore had nothing to do with the payment of any commission. This, however, constitutes no proof that there was such a fraudulent agreement between Ryan and Lamb as would avoid the sale.

I will therefore recur to the first and second grounds upon which the sale is attacked.

The rule in this state concerning the stability of judicial sales is undoubtedly a very rigid one. The only grounds upon which the inchoate right of a successful bidder can be frustrated is the presence of fraud or irregularity in the sale. Mere inadequacy of a bid, if the sale is regular, will not warrant the court in setting the sale aside and ordering a resale. This rule does not rest upon the right of a purchaser, because when he bids he understands that it is subject to the approval of the court, but it rests upon the grounds of public policy. It is adopted to encourage the attendance of bidders at judicial sales.

The reasons for the rule are stated, and the cases in which it has been applied in this state are cited by Mr. Justice Magie in his opinion in *Morrisse* v. *Inglis, 1 Dick. Ch. Rep. 301,* in the court of appeals. It is only when a bid is unconscionably below the value of a property—so low as to raise the inference that the sale must have been in some way fraudulent or irregular— that mere inadequacy will avoid the sale.

Nor does the rule seem to differ whether the court is asked to set aside a sale or is merely asked to refuse its approval of a sale. A distinction was pointed out by Chancellor Kent in *Osgood* v. *Franklin, 2 Johns. Ch. 1, 23,* between the influence of an inadequate consideration in suits for rescission of contract and its influence upon suits for specific performance. It would seem that following this distinction a court might refuse to approve a sale, when, upon the same facts, it would refuse to set aside a sale. The court would simply refuse to exert its power affirmatively. But Chancellor McGill, in *Bethlehem Iron Co.* v. *Philadelphia and Seashore Railroad Co., 4 Dick. Ch. Rep. 356, 363,* held that a receiver's sale was controlled by the rule laid down in *Morrisse* v. *Inglis, supra,* although the act of 1890 (*P. L. of 1890 p. 138*) required that all sales of land made by order of the court of chancery should be confirmed by the court.

It is quite clear that the price bid for these two properties is an inadequate consideration for them. Indeed, on May 2d a bond was executed to the executors conditioned that upon a resale another party would bid $50,000, or an excess of thirty-

three and one-third per cent. over the bid accepted.   In addition
to this there is testimony that the value of the land upon which
the mills are situated, and the machinery contained in the mills,
without regarding these mills as going plants, is worth four times
the amount of the bid.   But the question is whether this testi-
mony alone, or together with another feature which concerns the
manner of sale, is sufficient to support the order of the orphans
court.   The value put upon the land itself, regardless of any
structures thereon, is $13,400; and its value with the buildings
and without the machinery, $20,000.   The estimate of cost for
replacing the buildings at the Fair street mills is from $67,500
to $78,500.   It is also testified that it would cost $25,000 to re-
produce buildings of the size of the Factory street plant, but
that the present buildings are too poor to be the subject of valua-
tion for manufacturing purposes.

The estimate of valuation of machinery in the Factory street
mill is $37,153.60, and of machinery in the Fair street mill,
$88,557.   This estimate is exclusive of the valuation of the trans-
mitting machinery, which is valued at about $25,000, making
an aggregate valuation for the entire machinery of $150,711.
As I understand Mr. Hunter, the expert who testified to the ma-
chinery valuation, his estimate was made upon the basis of the
value of the machinery if taken out of the mills and separately
sold.   He says that to a purchaser who wished to leave the ma-
chinery in the place and operate it in the mills it would be worth
twenty-five per cent. more than his estimate.   It is to be observed
that Mr. Ryan, the present appellant, was one of the appraisers
selected by the executors of Wilson.   He estimated the valuation
of this machinery at $150,000.

Discarding the theory of the sale of the two mills as a plant,
to be operated as now equipped, and regarding only the value of
the land and the machinery in case the mills were disused, the
estimate would foot up to about $164,000.   Against this, as
already observed, the price realized was a trifle over $30,000,
which, with the encumbrances, brought the selling-price up to
the neighborhood of $39,000, or less than one-quarter of the
valuation put upon the property by the expert and the appraiser.
While I doubt whether under any circumstances the property
could be made to realize the sum of $160,000, I do not doubt

that the price realized was grossly inadequate. I am certain there was no one who knew these properties, whether by general knowledge or through the testimony disclosed in this case, but was struck with amazement at the price at which they were sold. In my judgment, the manner in which the sale was conducted was mainly responsible for this result.

It appears from the testimony that the Factory street mill building is in such a decrepit condition as to be unfitted for heavy machinery. It also appears, in respect to the Fair street mill, that absence of railroad facilities minimizes its value for manufacturing purposes, other than such as require little carting. These very unusual conditions would so materially affect the sale of each as an entire concern that, in my judgment, the land itself and the machinery within each factory are worth more—at least, would bring much more at a public sale than the plants themselves.

In this view the sale therefore was of not merely the machinery, but of the land and the machinery *en masse*. It can, of course, be said that prospective purchasers could calculate the value of the property in this way and so regulate their bids; but it is common knowledge that the larger the amount of money required for a single purchase, the fewer there are with ability to bid.

In my judgment, as one of the experimental methods of conducting the sale, the machinery should have been offered in small lots separately from the land.

In consideration of the price received, coupled with the manner of conducting the sale, I shall advise a confirmation of the order of the orphans court.

*Mr. John H. Backes,* for the appellant.

*Mr. William M. Lanning,* for the respondents.

The opinion of the court was delivered by

DIXON, J.

This is an appeal from a decree of the prerogative court affirming an order of the Mercer county orphans court, in which the

court refused to confirm a sale of two factories· in the city of Trenton belonging to the estate of Samuel K. Wilson, deceased, and which the orphans court had ordered the executors to sell for the payment of debts.

The statute under which the proceedings for sale were taken (*P. L. of 1898 p. 715*) requires by section 85 that after the sale is made, it shall be reported to the orphans court, and, if the court shall approve of the sale, it shall confirm the same as valid and effectual in law, and direct that a conveyance be executed.

In the opinion delivered in the prerogative court this requirement of confirmation ·was regarded as having no substantial effect, the view being that the court should confirm the sale, unless facts were shown which would justify the annulling of a judicial sale that did not need confirmation by a court to render it valid. This view was supposed to be sanctioned by the decisions in *Delaware, Lackawanna and Western Railroad Co.* v. *Scranton, 7 Stew. Eq. 429,* and *Bethlehem Iron Co.* v. *Philadelphia and S. S. Railroad Co., 4 Dick. Ch. Rep. 356.* The statute under consideration in .those cases enacted that certain judicial sales should be reported to the court and, if approved by the court, should be confirmed, with a proviso that no sale should be confirmed until the court was satisfied that the property had been sold at the highest and best price the same would then bring in cash. The opinions delivered by the court of chancery in those cases are thought to imply that a sale governed by that statute must be confirmed, if the highest and best price obtainable at the sale had been secured, unless the circumstances were such as to warrant the setting aside of a sale which would be valid without confirmation.

Without passing upon the correctness of that construction, we deem it inapplicable to the case now before us. Here the power of confirmation or rejection is untrammeled by the proviso which was supposed to narrow the scope of inquiry in the cases cited, and is committed without limitation to judicial discretion. By force of the statute the "sale" reported to the court is not a perfect contract made by competent parties, but is a bargain dependent upon the approval of the court to render it "valid and effectual in law." Such approval should, in our judgment, be

given or withheld upon consideration, not merely of matters pertinent to the avoidance of a complete contract, but of all matters pertinent to the question of accepting the proposal presented. Among those matters is evidently the propriety of the mode in which the auction was conducted. As was said by Vice-Chancellor Pitney in *Bliss* v. *New York Life Insurance Co., 6 Dick. Ch. Rep. 630,* if the sale is so managed as to discourage bidders and to result in a considerable sacrifice, that circumstance would justify the court in refusing to confirm the sale, even though the purchaser had nothing to do with such mismanagement. The court must regard the interests of those parties whose property it undertakes to sell, as well as the expectations of those who propose to buy.

We think the interests of the present owners were not duly protected at the sale under consideration. The property to be sold consisted of two factories, equipped with machinery for the manufacture of woolen goods. Of this machinery the manufacturing machines, in distinction from the appliances to transmit the power, were easily removable and were such as are salable separately. About a year before the sale these machines were appraised at $120,000 and the rest of the apparatus at $30,000, and the substantial accuracy of that appraisement is supported by the testimony of an expert taken in the proceedings now pending. Beside these values, the buildings and land are said to be worth $20,000 and the encumbrances upon the whole are about $10,000. With these estimates before them, the executors offered for sale each mill and its contents as an entirety, and the highest bid received for both is only $30,300. The number of persons attending the sale was fifty or sixty, of whom only five or six bid on the property as it was offered. No attempt was made to sell the separable machines in distinct parcels. While it is impossible to tell with certainty whether the bystanders would have become bidders for such parcels, we think the dictates of reasonable prudence required the executors to test that question. There is surely a probability that among so many attendants, some, unable or indisposed to buy an entire mill, would be able and inclined to buy single machines, and when the difference between the estimated value and the offers received

was so great, every practicable effort should have been made to avoid or lessen the impending sacrifice.

In order to permit further effort in the direction suggested, we concur in the refusal to confirm the sale reported.

*For affirmance*—THE CHIEF-JUSTICE, VAN SYCKEL, DIXON, COLLINS, FORT, GARRETSON, HENDRICKSON, ADAMS, VREDEN-BURGH, VOORHEES, VROOM—11.

*For reversal*—None.