This matter comes before the court upon exceptions to a master's report pursuant to an order of reference on a petition for credit of the fair value of the mortgaged premises on a deficiency claim filed after objections to confirmation of the foreclosure sale.
The amount due upon the complainant's decree on October 22d 1936, the date of the sale, was $785,760.30. The amount of complainant's bid, for which the property was struck off to it at the sheriff's sale, was $472,654.54. Prior tax liens, as reported by the master, amounted to $52,244.74, making the total purchase price at the sheriff's sale $524,899.28 (Young v. Weber,117 N.J. Eq. 242) and leaving an apparent deficiency of $260,861.02. The original mortgage to the Fidelity Union Title and Mortgage Guaranty Company, placed in 1923, was in the amount of $600,000. This had been reduced to $510,000 in 1930, when, upon the completion of the commercial building located on the premises, the loan was increased to $650,000 and a new mortgage in that amount was executed.
Objections to the confirmation of the sale and a petition for credit of the fair value of the mortgaged premises upon the deficiency claim were filed by the defendants pursuant to the doctrine and practice of Federal Title and Mortgage GuarantyCo. v. Lowenstein, 113 N.J. Eq. 200; Young v. Weber, supra, and kindred cases. In due course, the matter was referred to the Honorable Alonzo Church, as special master in chancery, but he died after the taking of considerable testimony and before its completion and report. By consent of counsel the matter was re-referred to another special master who, after taking voluminous testimony and proofs, reported the mortgaged premises to have had a fair value of *Page 150 
$850,000 on the day of the sale, apportioned as follows: land, $125,000; apartment house and commercial building, $717,500; one family dwelling house, $7,000; and garage, $500; and that delinquent taxes as of that date amounted to $52,244.74.
To this report one hundred and twenty-six exceptions have been filed by the complainant, in which practically every finding of the master is challenged and numerous issues respecting the admission or rejection of evidence are raised. While there is much in the master's report that is of value to the court, and there is some evidence to support his every finding, there are so many apparent errors in his conclusions of law and fact and in the application of the equitable principles which must govern matters of this kind, and the exceptions are so numerous, that I have decided to lay aside the report and consider the issues raised on objections to confirmation practically de novo. This is, in effect, granting the complainant's motion to set aside the master's report in toto, and I shall consider the evidence submitted before the master as though no report had been made. This procedure is, I think, justified by the circumstances, and the court is not obliged to accept a master's report as a matter of course, however much support it may find in the evidence. References to masters are made for the convenience of the court and litigants, and a master's report "is but a recommendation, merely advisory to, and not conclusive upon, this court."Oliver v. Autographic Register Co., 126 N.J. Eq. 18. And where, upon the coming in of the master's report, it appears to be more convenient to disregard the report and consider the issues de novo, the court will do so, notwithstanding there is evidence to support it, and especially so, where errors appear on its face. Holmes v. Holmes, 18 N.J. Eq. 141; MacDonnell v.Vitille, 111 N.J. Eq. 502, 508; Bank of America NationalAssociation v. LaReine Hotel Corp., 108 N.J. Eq. 567. Of course, the master's authority rises no higher than its source and the court may determine value itself without a reference, or in spite of such reference. Fidelity Union Trust Co. v.Pasternack, 123 N.J. Eq. 181.
It seems to me that the report shows on its face that the master erred in several main particulars, as follows: *Page 151 
1. He relied upon his own knowledge and ability as a judge of property values.
2. He relied too much upon replacement or reproduction value as a factor in fixing fair value.
3. He relied strongly upon the 1930 appraisal of the Fidelity Union Title and Mortgage Guaranty Company, the original mortgagee, which was not evidential.
4. He relied too much upon future or potential value as an element of fair value.
5. He gave too little weight to capitalization of income.
6. He misconceived the meaning of "fair value" as between the parties, giving greater importance to the protection of the mortgagor than to the mortgagee.
7. He relied too much upon theory and prophecy, and too little upon fact and reality.
For these reasons I have laid aside the report, read the entire record of approximately two thousand four hundred pages of testimony examined all of the numerous exhibits, and read and considered the voluminous briefs of counsel, both those submitted to the master and those submitted upon the exceptions to his report.
It is argued by counsel for the defendants that on the authority of Chasey v. Broadway Holding Co., 114 N.J. Eq. 74,
the court is obliged to confirm the master's report where there is any evidence to support it, and especially where the master is himself qualified to pass upon real estate values in the neighborhood of the mortgaged premises, and that the master's own opinion has the force and quality of testimony. But the argument is unsound and is not supported by the cited case, nor by any other reported case of which I have knowledge. Nor did the court there approve of the master's appraising the property on the basis of his own knowledge of real estate values. What the court said in that case was that the master's familiarity with property values better enabled him to choose between experts, appraise their testimony at its true value, select that expert opinion which was most reliable and adopt it as his own. If the rule were as contended by counsel for defendants, there would be no need for the taking of any testimony or the submission of any evidence before the master on references of this kind — the court would merely ask for a *Page 152 
master's opinion and adopt it as controlling. But that is not the rule. Long Dock Co. v. State Board of Assessors,86 N.J. Law 592, 597; United New Jersey Railroad and Canal Co. v. StateBoard of Taxes and Assessment, 100 N.J. Law 131. It is also argued that the master's report has the weight of a verdict of a jury. The law is to the contrary. See Holmes v. Holmes, supra;MacDonnell v. Vitille, supra.
Nor, in the instant case, was the master selected, as is suggested by counsel for defendants, because of his peculiar knowledge touching real estate values — although the court had and still has complete confidence in the master's ability and integrity.
Notwithstanding the apparent errors in the master's report, the voluminous exceptions might well be dismissed because they are extremely prolix and argumentative; but in view of the long delay attending this proceeding, because of the death of the master to whom the matter was originally referred, and other causes beyond the control of the parties, I have decided to overlook this formal defect.
The property involved in this inquiry consists of a tract of land located on the northwesterly corner of Clinton avenue and Stratford Place in the city of Newark. It has a frontage on Clinton avenue of three hundred twelve and eighty-five one-hundredths feet and on Stratford Place of one hundred and eighty-eight and seventeen one-hundredths feet. There are four buildings on this tract — an eight-story multiple apartment house; a commercial building containing stores and offices; a one-family frame dwelling house, and a two-story brick garage. The apartment house was erected in 1923; the commercial building in 1930; the dwelling and garage many years ago. For a complete and detailed description of the land and buildings and of the neighborhood in which they are located, reference may be had to the master's report. The record is silent as to the original cost of the land and the various buildings erected thereon, and while the various estimates of the value of the land given by the several realty experts are within reasonable range, the lowest being $100,000 and the highest $136,114, and four ranging from *Page 153 
$123,305 to $129,400 — the values put upon the buildings as of the date of the sale differ widely and range from $425,000 by the witness Ellery to $815,808.22 by the witness LaFountain, the latter estimate not including the frame dwelling house or the garage. The fair values of the entire premises as estimated by these expert witnesses also differed widely and ranged from that by the witness Schwebemeyer, of $535,000 to that by LaFountain of $815,808.22, plus land value of $125,000, frame dwelling $7,000, and garage, $500 as found by the master, and which valuations seem reasonably conservative, amounting in all to $948,308.22. The following is a schedule showing the several valuations of the various experts:
 SUMMARY OF REPLACEMENT COST OF LAND AND BUILDINGS AS OF
 OCTOBER 22, 1936.
 Name of Land Apt. Comm. Brick Dwell.
 Witness Value House Bldg. Garage House Total
Defendants' Witnesses
La Fountain .......... 745,911.08 69,897.14 .... .... $815,808.22
Stavitsky ... 136,114.00 621,600.00 72,120.00 500. 5500. 835,834.00
Cronheim .... 123,305.00 594,997.00 72,370.00 1000. 7000. 798,672.00
Neuscheler .. 129,291.51 610,500.00 73,440.00 960. 6600. 820,791.51
Kraemer ..... 128,038.00 612,231.96 66,130.00 1000. 7528. 814,927.96
Complainant's Witnesses
Miller ...... 111,912.50 Total cost of buildings $435,000.00 547,712.00
Schwebemeyer none given none given 535,000.00
Hannoch ..... 100,000.00 500,000.00 600,000.00
Ellery ...... 129,400.00 425,000.00 554,400.00

(NOTE — No replacement cost of buildings given by complainant's witnesses.)
But whatever the original cost or the intrinsic value at the time of sale, it is evident that the apartment house was an ambitious project designed to provide luxurious housing facilities for the socially-elect and wealthy Hebrews of the city of Newark. In keeping with this idea, the apartment house building contains one seventeen-room apartment with five baths, an eleven-room apartment with four baths, a ten-room apartment with four baths, and two eight-room apartments with four baths each. There are in all seventy-one rentable apartments containing 362 rooms, besides bathrooms, *Page 154 
and also thirteen maids' rooms detached from the tenants' quarters. The rooms in all apartments are unusually large and spacious, and quite in keeping with the ambitious idea giving rise to the improvement. That this fact contributed largely to the original cost and the various reproduction values of the several experts cannot, in my judgment, be reasonably denied.Cf. Turnley v. Elizabeth, 76 N.J. Law 42. This spaciousness of the apartments is hailed by the parties both as an advantage and a disadvantage from the standpoint of rentability. It is a fact, however, that the larger apartments have shown the greatest proportion of vacancies and the lowest rentals per room.
The commercial building is of substantial construction and quite in keeping with that of the apartment house, but at the date of the sale had many vacancies.
The rental history of the apartment house is interesting and shows that from 1923 to and including 1929 there were few vacancies, and average rentals per room were high. The gross income ranged from $150,350 in 1924 to $133,692.50 in 1923. There was a sharp drop in 1930 from $143,140 in the previous year to $127,335 and thereafter, down to and including 1935, there was a continual decrease in gross rentals and average monthly rentals per room. The following is a schedule showing the gross rentals, number of rooms rented and average rental per room per month for the entire period from 1923 to 1935, inclusive:
 No. of Average Rental
 Rooms Per Room
 Year Rentals Rented Per Month
 1923 ............ $133,692.50 355 $31.40
 1924 ............ 150,350.00 355 35.30
 1925 ............ 143,186.25 355 33.60
 1926 ............ 139,022.50 355 32.70
 1927 ............ 140,871.79 338 33.10
 1928 ............ 141,807.50 338 35.00
 1929 ............ 143,140.00 342 35.00
 1930 ............ 127,335.00 304 34.90
 1931 ............ 94,097.50 246 31.90
 1932 ............ 80,292.00 271 24.70
 1933 ............ 64,367.00 268 20.00
 1934 ............ 66,698.00 302 18.40
 1935 ............ 65,027.00 297 18.25
 *Page 155 
It will be noted that the average rental per room per month ranged from $35.30 in 1924 to $18.25 in 1935.
Strenuous objection to the admission of any evidence touching income yield prior to 1932 was made before the master on behalf of the complainant, but the objection was overruled and properly so, as the court is entitled in a proceeding of this kind, where only equitable rights are involved, to the fullest possible information concerning the mortgaged premises. Cf. MontclairRailway Co. v. Benson, 36 N.J. Law 557. Income yield during prosperous years is as important as that of lean years, and without such information the court would be groping in the dark for that elusive formula which might spell the exact equity to which the parties are both entitled. While ordinarily income yield for so remote a period as 1923, thirteen years before the sale, might be entirely irrelevant, in this proceeding it is not. The weight to be given such evidence, however, is for the court to determine.
So also with reproduction cost. Objection was made before the master to the admission of any evidence touching replacement value or reproduction cost on the ground that only capitalization based upon income should be considered in fixing fair value in this proceeding — that the value of the mortgaged premises to the mortgagee could be measured only by the return on the investment. So insistent upon this objection was counsel for complainant that he refrained from offering any evidence whatever on reproduction cost, contenting himself with lengthy cross-examination of defendants' experts touching such costs. But the master properly overruled this objection. Replacement value is a factor to be considered — although as applied to property of the character of that here involved, correctly, as I think, classified by the complainant as investment property, it has little weight compared with income value. Nevertheless, it is a factor to be considered by the court in fixing fair value for the purpose of this proceeding, and is of value in determining the permanency of the improvement.
Complainants' contention is that the apartment house was misplaced, that it is too good for the neighborhood in which *Page 156 
it is located and that for that reason reproduction cost was of no materiality. Without referring in detail to the evidence touching this question, it cannot be denied that there has been some deterioration in this neighborhood since the apartment house was built, because it is in process of transition from a high-class residential section to something else. All experts agree that this is so, but some said the objective was a high-class apartment house neighborhood while others that the trend was definitely toward business — or worse. This fact of transition, whatever may be its objective, has without a doubt had some effect upon the rentability of the apartments. InFidelity Union Trust Co. v. Greenfield (unreported, Docket 116, page 67), Vice-Chancellor Bigelow said: "Newark as a residential city has been rapidly deteriorating for several years and this process does not appear to be abating." In 1927, by amendment to the zoning ordinance of the city of Newark the neighborhood in which this property is located was changed from a residential to a business zone. The master found that this apartment house is not misplaced and that the neighborhood influence was not disadvantageous. The theory upon which complainant's case was presented with relation to this point is, however, sound. If the building is misplaced it can have little value as an investment. In re Blackwell's Island Bridge,103 N Y Supp. 441, 444. Nor can it be denied that this apartment house has suffered a certain amount of obsolescence during the thirteen years of its existence from 1923 to 1936. It is idle to say that there have been no improvements in apartment house construction since 1923.
In considering reproduction cost or replacement value as a basis for fixing fair value in this proceeding, the master accepted the highest estimate given by any of the experts — that of the witness LaFountain. But in my judgment none of the estimates of replacement value submitted by defendants (none were offered by complainants) is entitled to very much weight in considering the issues here presented. Those estimates cannot be relied upon for accuracy. They can be approximate only. All, with one exception, that of the witness *Page 157 
Kramer, were based upon an assumed cost per cubic foot and figured upon the cubical content of the building. Dr. Kramer's estimate did not even have that virtue, and, because of his method, or lack thereof, is disregarded entirely. The assumed cost per cubic foot varied from fifty-two cents to sixty-six cents. LaFountain said the proper figure was from sixty-two cents to sixty-six cents per cubic foot, but did not say which of these two, if either, he used. The cubical content of the apartment house being one million four hundred and eighty-five thousand eight hundred and thirty-one cubic feet, it is obvious that a variance of fourteen cents per cubic foot must spell a wide variance in replacement cost; in fact, in excess of $200,000. LaFountain's estimates of reproduction cost of the commercial building were based upon a cubical content of two hundred and fifty-seven thousand five hundred and eighty-one cubic feet, at thirty-two cents per cubic foot.
It appears to me that at best such estimates are but rough guesses. In my judgment, an accurate estimate of reproduction cost could have been obtained only by a study of the plans and specifications (none of the experts saw the specifications) together, making up a list of materials necessary for the construction specified; figuring the cost upon the basis of current prices; estimating the amount and cost, at current wage scales, of labor required; adding the cost of various types of contractor's insurance; setting up a reasonable margin of profit and a safe percentage to cover contingencies; and adding architect's fees at from five to eight per cent. on the cost thus found, and, perhaps, other items. I understand that estimates based upon the cubical content of a building usually include architect's fees, although LaFountain said his did not. But here, architect's fees were added to almost every original estimate, apparently as an afterthought, and in some instances by the master by suggestion or otherwise. It seems strange that neither side of this controversy produced an architect or other witness who could or did figure reproduction cost upon a reasonable or scientific basis.
For these reasons I regard the evidence touching reconstruction *Page 158 
costs of very little value. Reproduction cost, even if the estimates were reliable, would be of much less value as applied to the mortgaged premises than if applied to a one-family dwelling. Few dwellings are without some sales value, because families must have homes, and there is always some family which will live in any particular dwelling. If neighborhood changes have made it less desirable as a habitation for the wealthy or socially elect, it may still be desirable from the standpoint of the less fortunate, even the lowliest of whom want homes and are willing to buy at some price. But that is not true as to million-dollar apartment houses, or large commercial buildings, the market for which at any time is necessarily restricted. Ordinarily there is no market for such property unless it produces sufficient income to make it attractive as an investment, or unless it has high speculative value.
All parties agree that capitalization based upon income is a proper element to be considered in fixing fair value, but there is wide disagreement as to the weight to be given such capitalization. Counsel for defendants claim that it is an element of much less importance than reproduction value and counsel for complainants that it is the only element to be considered. Neither is correct, although I believe that income value alone is entitled to more weight in fixing fair value than all other elements combined when investment property of this particular type is involved. All of complainant's experts and one of defendants' experts, Cronheim, said that as applied to investment property, income is the true criterion of value.
The master, basing his conclusion upon an assumed gross income of $140,000 per annum and a net income of $53,327, capitalized it at five per cent. and found a value of $888,783. But this capitalization was based upon potential income and not upon actual return — rather upon more than twice present income, and allowing only ten per cent. for vacancies, notwithstanding that at the date of the sale ninety-eight rooms, or over twenty-seven per cent., were vacant.
Potential value is anticipated value — a value which the *Page 159 
property is capable of producing under hoped-for conditions in the future — usually referred to as normal. But subnormal economic conditions, so-called, have now been with us so long that there is a suspicion, at least in the minds of many, that these conditions are really normal and that the hoped-for improved conditions, if ever realized, will be abnormal. Professor Bonbright, in his work entitled "The Valuation of Property," at page 846, says:
"The potential horse power of a river can be measured within certain limits by expert engineers — the potential value of property, being by definition the price which the property is expected to command after the return of normal times, has no limit beyond the imagination of the judge or the appraiser who is doing the expecting."
Potential value as applied to the premises in question is more or less speculative value, but a mortgagee purchaser ought not be compelled to speculate for the benefit of his debtor-mortgagor.
Capitalized value based upon income, actual, estimated, or so-called stabilized income, whatever that means, as found by the several experts, varied widely. The following tabulation will show the various capitalized values fixed by the several witnesses: *Page 160 

 SUMMARY OF VALUES INVOLVING CAPITALIZATION OF INCOME
 Name of Rental Value Gross Gross
 Witness Per Room Income Expenses Depreciation
Defendants' Witnesses
Stavitsky ....... $30.00 $139,200.00 $63,438.00 $14,000.00
Cronheim ........ 30.00 140,220.00 77,546.00 13,500.00
Neuscheler ...... 30.00 138,492.00 76,637.22 13,830.00
Kramer .......... 30.00 based on 139,200.00 68,668.00 13,003.00
 past average plus 7680.
 of 29.56 for 6% on
 land value
Complainant's Witnesses
Miller .......... $22.00 99,137.00 58,341.00 already
 plus 6714. reflected
 int. on land in
 value expenses
Schwebemeyer ..... 19.00 78,150.00 57,673.00 .......
Hannoch .......... 22.00 plus 88,993.00 49,250.00 .......
 plus 3500.
 int. on land
 value
Ellery ........... Actual present
 rentals 88,950.00 56,388.00 .......
 plus 6470.
 as 5% int.
 on land value
 of $129,400
 Name of Rate of
 Witness Net Income Capitalization Capitalized Value
Defendants' Witnesses
Stavitsky ....... $49,438.00 6% $823,966.00
Cronheim ........ 49,173.00 6% 819,550.00
Neuscheler ...... 48,024.78 6% 800,413.00
 ___________
Kramer .......... 49,849.00 7.3 687,000.00 buildings
 128,038.00 land
 ___________
 815,038.00 total
Complainant's Witnesses
Miller ........... 34,872.00 6% 435,000.00 buildings
 111,912.00 land
 ___________
 547,712.00 total
Schwebemeyer ..... 21,477.00 4% 535,000.00
Hannoch .......... 35,245.00 6% 500,000.00 buildings
 100,000.00 land
 ___________
 600,000.00 total
Ellery ........... 32,562.00 6% 425,000.00 buildings
 6,470.00 129,400.00 land
 _________ ___________
 26,092.00 554,400.00 total
 *Page 161 
These variances in capitalized value as fixed by the several experts are due mainly to (1) the rental value of the rooms as found by them respectively, and ranging from $19 to $30 per room per month; (2) gross expenses ranging from $77,547 (Cronheim) to $49,250 (Hannoch); and (3) the rate of capitalization. Nearly all the witnesses capitalized income at six per cent., but some used different rates for land and buildings, for what reason I am unable to understand, nor was any reason suggested. It seems to me that the land and buildings must be considered as a unit for the purpose of this inquiry, and capitalized at a single rate.
But all the estimates by defendants' witnesses are based upon theory and prophecy — not upon fact and reality — upon anticipated or potential income. And all of defendants' experts figured upon $30 per room per month while the average rental per room per month during the thirteen years since the apartment house was built shows an average rental of $29.56. This period includes eight prosperous years and but five of the leaner years. I am not so optimistic as to believe that a like period of prosperity and high rentals will be experienced again within the next two decades and the complainant trustee ought not to be compelled to gamble on it. We must not lose sight of the fact that this trustee represents numerous investors who have as much right to equitable consideration and protection by a court of conscience as have the unfortunate and distressed mortgagor and those liable on the bond.
At the oral argument on these exceptions I was inclined to the opinion that the master properly overruled the objection to the admission in evidence of the 1930 appraisal of the Fidelity Union Title and Mortgage Guaranty Company, the original mortgagee, and so announced, stating, however, that while it had some value little weight should be given to it. I regarded it merely as a circumstance to be considered. But since that time my attention has been called to the unreported decision of Vice-Chancellor Bigelow in Fidelity Union Trust Co. v. Dalton (Docket 118, page 77), a proceeding like this, in which he ruled otherwise, and held that such an appraisal could not bind the investors who held mortgage certificates *Page 162 
issued against the mortgage there involved. And see Home OwnersLoan Corp. v. Grundy, 122 N.J. Law 301, in which the court of errors and appeals held that an appraisal of the mortgaged premises made on behalf of the mortgagee just prior to the time the mortgage was executed was inadmissible as evidence of "fair market value" in a deficiency suit. While the appraisal in that case was not on all fours with the appraisal here offered and admitted, that having been made by an independent appraiser and this by the original mortgagee itself, the case is sufficiently analogous to be controlling and it would appear that the appraisal was here improperly admitted by the master. That it had great influence upon his opinion as to value of the mortgaged premises is quite apparent from a reading of the report, notwithstanding there was independent evidence of the same value in 1930 as that shown in said appraisal.
Considerable testimony was taken and there was much discussion during this proceeding touching the advisability of converting some of the larger apartments in the apartment house into smaller apartments, on the theory that the smaller apartments are more readily rentable. Many witnesses on both sides were of the opinion that this should be done and the master reported to that effect. Two estimates of the cost of such alterations were submitted, one of $20,000 by the witness Cronheim and one of $103,000 by the witness Sherman. Cronheim suggested the alteration (conversion) of all apartments of seven rooms and over — Sherman of all those of six rooms and over. Considering these facts, there is not so wide a divergence of opinion as to cost of the proposed alterations as would seem at first blush. The master found that all apartments of eight rooms and over should be converted and allowed $20,000 in his computation for that purpose. While the advisability of such alterations and their probable effect should be considered as having some bearing upon potential value, the fair value of the property here involved should be fixed as it was at the time of the sale and not in its altered condition, especially where the proposed alterations would entail an expense of many thousands of dollars which the trustee complainant may not have available for that purpose. *Page 163 Northwestern Loan and Trust Co. v. Bidinger, (Wis., 1938),276 N.W. Rep. 645. In considering the effect of such proposed alterations upon potential value their cost would be a deductible item in fixing fair value and the effect upon income of probable loss of rents during the period of the alterations should also be taken into consideration.
 FAIR VALUE.
I approach the question of fair value in this proceeding with some diffidence. However, as was said by the New York court inCorn Exchange Bank and Trust Co. v. Ekenberg,292 N.Y. Supp. 142; 161 Misc. 62, "The question is a difficult one, but nevertheless must be determined." Since the Lowenstein Case was decided much has been written upon the subject of fair value, fair market value, reasonable value and similar terms, but no definition of the term "fair value," which can be universally applied to every case involving a deficiency claim, has yet been evolved.
In the Lowenstein Case (at p. 202), it was said:
"The property * * * can be given some reasonable valuation arrived at by regard to the capitalization of income, present cost of replacement of the buildings and the likelihood of demand for that kind of property whenever the real estate market becomes fairly normal again."
And an appraisal made upon that basis was accepted by the parties as "fair value" for the purpose of that case.
In Weiss v. Keystone Realty Co., 14 N.J. Mis. R. 65;182 Atl. Rep. 478, Vice-Chancellor Egan said (at p. 67):
"There does not appear to be any fixed rule by which `fair values' shall be determined or established. If the result attained, be it a high or low estimate of value, finds support in competent evidence, and is based upon reason, equity and justice, the court will accept it; but it will not accept the estimates of the master if it feels that the circumstances do not warrant such judgment; it may approve or disapprove the estimates fixed by the expert witnesses; and it may establish what — from all the evidence — it believes to be the fair value. * * *" *Page 164 
In Kotler v. John Hancock Mutual Life Insurance Co.,113 N.J. Eq. 544 (at p. 547), Vice-Chancellor Stein said:
"Meanwhile I doubt whether under present conditions there exists any commonly accepted basis upon which the value of real estate can, with reasonable definiteness, be determined."
In Rose v. Jerome-Harvey Development Co., 115 N.J. Eq. 574,577, Mr. Justice Case, speaking for the court of errors and appeals, said:
"The measure for fixing `fair value' or `fair and reasonable value' under such circumstances has not been determined and the quoted expressions as used in the proceeding have not been defined. `Replacement value,' `market value,' `the highest and best price the same would then bring in cash' — these and similar expressions have recognized meanings. But an equitable determination of a value that is `fair' as between a lender who fortified his investment by demanding and receiving a contractual bond and a borrower-owner, or one who stands in his stead, whose property is forcibly thrown, in the midst of a universal depression and money demoralization, upon a temporarily paralyzed market will likely be found to be none of these and may depend upon the special equity of each case as presented. * * *"
In Northwestern Loan and Trust Co. v. Bidinger, supra, the court said:
"From these holdings, it is apparent that `fair value,' as used in our cases and which we have held that a court, in the exercise of its equitable powers, may require a mortgagee to credit upon the mortgage indebtedness as a condition of immediate confirmation, is that amount which, under all of the circumstances of a given case, will not shock the conscience of the court. A bid which, under all of the circumstances, is grossly insufficient or unconscionably inadequate, and which if credited upon the mortgage indebtedness, would operate as a great injustice to the mortgagor, does not, of course, comply with the concept embodied in the term `fair value.' `Fair value' obviously does not mean `market value,' as that term is generally understood, or that value which the property may probably have in the future under more favorable economic conditions, or that value which it may have if the *Page 165 
property be remodeled and put to other or more extensive uses which possibly may prove more profitable. It is, of course, difficult to state a rule which may readily be applied to every possible situation. Trial courts, however, should have no great difficulty in applying the rules stated, if they will keep in mind their obligation to do justice between both mortgagors and mortgagees."
But whatever the mode of approach or the method of arriving at fair value, the result must be in accordance with sound reasoning, justice and equity. See Chasey v. Broadway HoldingCo., supra.
The words "fair value," as used in the Lowenstein Case, were chosen advisedly, and it is with those words only that we are concerned. In the Wisconsin case, supra (Northwestern Loan andTrust Co. v. Bidinger), the term is applied both to the property and to the bid, and it is said that fair value is "that amount which will not shock the conscience of the court." But our courts have recognized a distinction between a bid which will shock the conscience of the court and that which is considered "fair value" as between the parties.
The measure of fair value under our decisions is not that which will not shock the conscience of the court, but that value which under all the circumstances is fair as between the parties — not universally. And "an equitable determination of a value that is fair as between a lender * * * and a borrower," as was suggested by Mr. Justice Case in Rose v. Jerome-Harvey Development Co.,supra, will likely depend upon the special equity of each case as presented. See, also, Hillside National Bank v. Silverman,116 N.J. Eq. 463, 465. It is next to impossible to provide a definition or formula for such value which can be uniformly applied to all cases, and of necessity each case as it arises will depend upon its own special circumstances, and will be a law unto itself. But in the effort to fit fair value into varying sets of circumstances we run the risk of reviving Selden's ancient libel that "equity is like the Chancellor's foot."
In determining fair value, factors other than income yield must, of course, be considered; but they are useful only as *Page 166 
a check upon the main factor of income where investment property is involved. The investor (not the speculator) is interested in real estate only because of the return which can be obtained from it; and a purchaser of investment property will pay more or less for it depending upon the likelihood of its income increasing or decreasing. For this reason, potential value is pertinent in checking on the stability of rentals; neighborhood conditions and trends are important for the same reason; reconstruction value is important, not as indicating sales value or income yield, but mainly on the question of permanency of the structures forming a part of the investment property and their prospective life. Income yield, however, is the most important factor to be considered, and this is in accordance with the opinion of all of complainant's expert witnesses and at least one of those of the defendants.
We may arrive at a proper definition, perhaps, by the process of elimination. It is not market value, for this proceeding assumes that there was no market. It is not reconstruction or replacement value, because cost seldom reflects value and especially is this so with investment property; it is not so-called "real value;" it is not intrinsic value; nor necessarily income value alone; nor potential value, nor "the highest and best price that the same would then bring in cash." In my judgment, fair value for the purposes of the instant proceeding is that sum which the mortgagee purchaser ought, under all the circumstances, reasonably expect to realize from the acquired premises either by way of sale in the near future or upon the basis of a permanent investment. This formula, I think, may easily be applied to all cases involving property like that involved in this proceeding, i.e., investment property. Professor Bonbright, at page 839 of his work, "The Valuation of Property," says:
"Only such value as would redound to the benefit of the mortgagee is material under the traditional laws of creditor and debtor, and this value must be either the price at which the property can be sold, or the value of the foreclosed property to the mortgagee if it is turned over to him instead of money."
In estimating this value, however, effect should be given *Page 167 
to potential value and all other elements having any bearing upon fair value, including replacement cost, neighborhood influence and trend.
So far as the future sale of the property here involved is concerned, there is no evidence that there is any prospect, or even hope, of a sale in the near future at any price which would make the mortgagee whole, or even at the price bid at the sheriff's sale. Certainly there was no market at the time of that sale, otherwise the parties would not be here. And there is no evidence of any market for this property now. It would seem, therefore, that the complainant is destined to hold the mortgaged premises as an investment for an indefinite period of time. A mortgagee who has been compelled to purchase the pledge and retain it as an investment should not be expected to retain it at a continuing loss, and equity to the mortgagor does not require that he do so.
When the mortgage which was foreclosed in this suit was executed there was no intention on the part of the mortgagee to become a purchaser of the property. To guard against such a contingency the mortgagee fortified its investment by demanding and receiving a contractual bond (Rose v. Jerome-HarveyDevelopment Co., supra), with sureties who are defendants in this suit. Nor was there any intention on the part of the mortgagor to sell the mortgaged premises to the mortgagee. It was a mere borrowing and lending transaction in which the borrower pledged its property as security for the repayment of the loan and in addition furnished sureties who agreed to make good any deficiency in the event of foreclosure and sale of the pledged property at a sum less than that due on the obligation.
By force of circumstances beyond the control of either party to the transaction, the mortgagee (or the substituted trustee standing in its stead) has become an unwilling purchaser at a price deemed by it to represent the full value of the mortgaged premises. (I will deal with the question of unconscionableness of the bid later.) Since the mortgagee has, by force of such circumstances, been compelled to become an unwilling purchaser, it ought not, as an added penalty, be required to shoulder the burden of defendants' loss, if any. *Page 168 
Professor Bonbright, at page 839 of his work, suggests that the theory of these deficiency cases "is that in an economic depression such as the present one, the law will compel mortgagees to share a larger burden of the common misfortune than would be required by the observance of the traditional rules." But the statement, as applied to this court is, I think, too broad. All that we have held is that this court will not permit the mortgagee to obtain a double satisfaction of his debt. No court in this state has held that the mortgagee is not entitled to have his debt paid in full; but under circumstances warranting chancery's exercise of its inherent power to that end, the mortgagee has been prevented from applying his security to the debt at a figure so far below its then value as to shock the conscience of the chancellor, and then pursuing his remedy on the bond in addition. The court will not say that the mortgagee must "share a larger burden of the common misfortune," i.e., take a loss on his investment, merely because the mortgagor has become an unfortunate victim of economic conditions. It was to guard against that very thing that the mortgagee fortified its investment by demanding and receiving a contractual bond (Rose
v. Jerome-Harvey Development Co., supra) with sureties. The loss should be borne entirely by the mortgagor, if he has the means, and he must keep his contractual obligation to make the mortgagee whole, if it is possible for him to do so, although he will not be obliged to pay his debt twice. Justice to a mortgagor does not justify injustice to the mortgagee (Fruzynski v.Jablonski, 117 N.J. Eq. 117), nor does it require the mortgagee to take an unnecessary loss. We have already held that theLowenstein doctrine was evolved for the benefit of the impecunious mortgagor, not for the debtor who wants to unload by selling his property to the mortgagee. Maher v. Usbe Buildingand Loan Association, 116 N.J. Eq. 475; Harvester Building andLoan Association v. Kaufherr, 122 N.J. Eq. 373. In the UsbeBuilding and Loan Association Case (at p. 477), we said:
"The decision of this court in Federal Title and MortgageGuaranty Co. v. Lowenstein, 113 N.J. Eq. 200, relied upon by complainant, was born of an emergency, but it established *Page 169 
no general rule requiring the allowance of credit for the value of premises sold at foreclosure sale. Emergencies such as arose in the Lowenstein Case are essential to invoke the equities there stated. Those equities are well founded in principle, but may be invoked only by the distressed. The disappointed but affluent mortgagor may not take advantage of a rule designed to relieve distress during an emergency to avoid payment of his debt and unload his unprofitable land upon an unwilling mortgagee who is as much entitled to the protection of this court as is the mortgagor."
 "FAIR VALUE" OF THE MORTGAGED PREMISES.
This brings us to a consideration of the value of the mortgaged premises to the complainant as investment property. And it is primarily the value to the complainant, and not so much the value to the defendants, which we are bound to consider.
I cannot accept the values fixed by the defendants' witnesses, all of which values are in excess of $800,000, because they reflect an optimism that I do not think is justified by present economic conditions. Nor do I accept the value fixed by the complainant's witness Schwebemeyer who is slightly more pessimistic than I care to be. Of all the expert witnesses who have testified in this proceeding, the one who has impressed me most is the witness Hannoch, because of his frankness and what I consider to be his unassailable logic. That he was as well, if not better, qualified as an appraisal expert than any of the other witnesses clearly appears from the record, and I rely strongly upon his testimony, because he faced realities and dealt with facts rather than with theory and prophecy. That he became embroiled in a controversy touching the merits and demerits of different classes or nationalities of Hebrews was extremely unfortunate, but the duel of words on cross-examination did not, in my judgment, detract from the value of his testimony on the subject of property values. The controversy had no place in this proceeding and should have been excluded by the master, as our courts do not measure justice by the yardstick of race, color *Page 170 
or creed. And it is worthy of note that he was not cross-examined on his expert testimony at all.
In explaining his appraisal, the witness Hannoch testified as follows:
"After making a careful study of all the factors which I thought affected the value, and most of which I have already testified to, I established what I considered to be a stabilized gross income for this property, which would not be the rental as of October, 1936, actually received, but a rental which in my opinion would represent the up and down of rentals over the reasonably near future. I have not undertaken to set a flat rate per room for those apartments, because I did not think that was a proper way to do it. The fact that there are many large units will not allow a flat rate per room calculation, because, naturally, two and three-room apartments are not going to have the same rate per room as the seventeen-room apartment, or the ten or eleven-room apartments, so I have taken the various units as they exist and have allocated a stabilizing rental to each group of units."
Hannoch was the only witness who based his opinion of income yield on different rates per room per month for different apartments, and his rates ranged from $17.65 per room per month for the large apartments to $27.50 for the small. All other witnesses used an average rental per room per month. Four of defendants' experts based their estimate of income yield on $30 per room per month. An analysis of Hannoch's schedule for the purpose of comparison with other appraisals will show that his average per room per month was $22.21 which, in my judgment, is sufficiently optimistic. He estimated $92,240 gross rentals from the apartment and allowed fifteen per cent. for vacancies, which I think is reasonable, especially in view of the fact that at the date of the sale vacancies amounted to over twenty-seven per cent. This allowance spells a deduction of $13,836 from the annual income, leaving $78,404 anticipated rentals from the apartment house alone. There was very little disagreement touching the income from the other buildings and for the purposes of this discussion I take Hannoch's figures of $6,213 for the stores and $2,880 for the offices — a total of $9,093 for the *Page 171 
commercial building, and $900 for the dwelling. This shows gross income of $88,397 per annum. Actual operating costs, according to the witness, Ellery, were $56,388, although Hannoch estimated them at $49,250. The witnesses Miller and Schwebemeyer estimated such expenses at $58,341 and $56,673, respectively, which are practically the same as the actual expenses. I think it is fair to figure an actual, instead of anticipated operating costs. The actual expenditures were not criticised by defendants' experts, in fact their allowances for such expenses were many thousands of dollars above actual costs. It is not perceived how an increased income could be produced at less than the present actual cost. Deducting actual operating charges from total rental of $88,397 leaves a net income of $32,009 and this, capitalized at six per cent., would give the property an investment value of $533,493. I have capitalized the income on a six per cent. basis because that is the legal rate and the rate used by all but one of the defendants' experts, and the average of the rates used by complainant's experts was the same. Had the complainant been paid the amount of its decree instead of being obliged to purchase the mortgaged property, it would have had the right to reinvest on any basis it chose up to six per cent., but an unwilling investor ought not be compelled to accept less than the legal rate.
The net income yield found by the complainant's witness Ellery was $32,562 and by Miller $34,872, and, capitalized at six per cent. would result in investment values of $542,700 and $581,200, respectively. Next to the witness Hannoch, I think these witnesses painted a truer picture than any of the other experts. In fact, if we were to deal exclusively with realities, the figures of the witness Ellery should control; but I feel that the more liberal figures of Hannoch are fairer to the defendants and reflect a not unreasonable potential value. I have disregarded the higher income figures of the defendants' experts because I believe they are based upon a rental rate which may never again be realized, or if realized at all, not until the distant
future. Those witnesses explained the present low rental rate of $18.25 per room per month as compared with their estimate of $30 by charging mismanagement *Page 172 
of the property by the present rent receiver. He is a member of one of the outstanding real estate firms of the city of Newark and was chosen by the court. In all the criticism leveled at the management by these witnesses I find nothing to shake the court's confidence in its receiver or to explain the wide discrepancy between actual rentals and the hoped-for $30 per room per month forming the basis of the income estimated by them.
The appraisals of these three experts, as given before the master, are as follows: Hannoch, $600,000; Miller, $547,712; Ellery, $554,400.
Bearing in mind that fair value for the purposes of the instant proceedings is that sum which the mortgagee purchaser ought, under all the circumstances, reasonably expect to realize from the acquired premises either by way of sale in the near future or upon the basis of a permanent investment, as above suggested; bearing in mind, also, that there is not even the prophecy of a market for the sale of this property in the reasonably near future, and that the witnesses Hannoch and Miller have given full effect to potential value in estimating income, it is my conclusion that a value of $600,000 is fair as between the parties for the purposes of this proceeding, and that that figure gives full effect to all potential value and all other elements bearing upon fair value which may reasonably be considered. If I have erred in this appraisal my error favors the defendants rather than the complainants. The value which I have found is $50,000 more than the figure at which the mortgagee, with the approval of eighty-eight per cent. of its cestuis, has offered to convey the property or assign its bid to defendants, or anyone else (Better Plan Building and Loan Association v. Holden,114 N.J. Eq. 537-542) and about $75,000 more than its bid. It is argued that as the trustee was authorized to stop bidding at $550,000 that figure represents fair value. The argument has no basis in fact or law. The foreclosed mortgage was one of the mortgages withdrawn by the present substituted trustee from the custody of the trustees in the matter of the administration of the affairs of the Fidelity Union Title and Mortgage Guaranty Co. Early in the administration of that trust, *Page 173 
a general order was entered requiring the trustees, in the event of foreclosure of a mortgage held by them, to bid the full amount of the decree at the sheriff's sale unless a lower bid was approved by all the investors in mortgage certificates issued against the particular mortgage. Upon application of the substituted trustee, on notice to all of the investors, this general order was modified so as to permit the substituted trustee to stop bidding at $550,000, the sum at which it had appraised the property. While this order was binding upon all of the investors in mortgage certificates issued against this mortgage, eighty-eight per cent. of whom had consented to the entry of such order, it was not binding upon the defendant mortgagor or those liable on the bond, because they were not parties to the proceeding, the purpose of which was to fix the value of the mortgaged premises only as between the substituted trustee and its cestuis que trust, in order to avoid a surcharge against the trustee later if the mortgaged premises were purchased at the sheriff's sale by a stranger on a bid less than the amount of the decree. Cf. Fidelity Union Trust Co. v.Dreyfuss, 121 N.J. Eq. 281.
The master, in fixing his value of $850,000, relied upon a number of cases, mostly of foreign jurisdictions, involving value for the purpose of taxation. The cases are cited in his report but they are not applicable to this controversy. Assessed value, or value for taxation purposes, is not the yardstick of fair value in an equitable proceeding. If it were, the 1935 assessed value of $548,900 would control. The assessed value for 1936 does not appear in the record. In the Lowenstein Case the assessed value was $39,100 and fair value for the purposes of that proceeding was fixed at $27,500. The master also relied strongly on Heiman v. Bishop (1936), 272 N.Y. 83; 4 N.E. Rep.
2d 944, and Corn Exchange Bank and Trust Co. v.Ekenburg, supra, in fixing fair value. But neither of those cases is applicable because what was involved there was the construction of a statute which requires the "fair and reasonable market value" to be credited upon a deficiency claim; and that statute expressly provides that in the absence of a market at the time of sale, the value at such nearest date as there shall have been any *Page 174 
market shall control. The statute further provides that the court shall determine "the fair and reasonable market value of the mortgaged premises as of the date such premises were bid in at auction, or at such nearest date as there shall have been any market value thereof;" and that there shall be no deficiency judgment where the ascertained value equals or exceeds the mortgage debt. We are not here concerned with the construction of any statute, but our problem is solely an adjustment of the equities between the parties. While the court in those cases endeavored to do equity to both mortgagor and mortgagee, and correctly recited the various elements of value to be considered, this court is not bound by those decisions nor the decisions of the courts of any foreign jurisdiction. We are free to adopt or reject the reasoning and judgment of such other courts according as they appeal or do not appeal to our sense of justice and equity. Morris v. Glaser, 106 N.J. Eq. 585, 614.
 THE BID
Having determined the fair value of the mortgaged premises for the purposes of this proceeding to be $600,000, I now turn to the question of the unconscionableness of the complainant's bid of $525,000. Is that bid, under the circumstances of this case, so widely at variance with the fair value as to shock the conscience of the court? And this leads us to an inquiry into the genesis of the doctrine of the Lowenstein Case and those which followed in its wake. As was said in Young v. Weber, supra, it had its foundation in the ancient equitable maxim that equity will not suffer a double satisfaction. Francis, Maxims (1723) XI.
But this case presents a far different situation from that which resulted in the evolvement of the Lowenstein doctrine. There the purchase by the mortgagee at the sheriff's sale was upon a nominal bid of $100, the agreed fair value of the property was $27,500, and the mortgagee, whose decree was for $41,787.36, sought to enforce payment by the mortgagor of the full apparent deficiency — the amount of the decree less $100 — and at the same time insisted upon retaining its pledge. This was plainly an *Page 175 
attempt to obtain a double satisfaction of the debt. The mere suggestion of such a result was sufficient to shock the conscience of the court, and it was deemed equitable to impose upon the mortgagee-purchaser the condition that the "fair value" of the mortgaged premises should be credited on the deficiency claim as a prerequisite to the confirmation of the sale. But no such situation is presented here. It cannot be said that a bid of $525,000 for a property fairly worth $600,000 is a nominal bid even though in "normal" times that property may have had a value of $1,000,000.
As a general rule, prior to the economic depression, mere inadequacy of price bid at a sheriff's sale was not sufficient to warrant denial of confirmation. And it was gross inadequacy of price, coupled with the unconscionable conduct of the mortgagee in seeking a double satisfaction of his debt that resulted in the doctrine of the Lowenstein Case. Federal Title and MortgageGuaranty Co. v. Lowenstein, supra; Young v. Weber, supra;Maher v. Usbe Building and Loan Association, supra.
The underlying principles of those decisions were not new in equity jurisprudence. See Kinmonth v. White, 61 N.J. Eq. 358,361, and Bourgeois v. Risley Real Estate Co., 62 N.J. Eq. 211.
Their application alone was novel. But new applications of old legal or equitable principles based upon "different postulates and world conditions" (Fifth Avenue Bank v.Compson, 113 N.J. Eq. 152) and the application of new legal or equitable doctrines and concepts are always fraught with danger. The peril of over-application of the new doctrine often arises from the enthusiasm or acclaim attending its evolution, like that of the child upon the discovery of a new toy; and care must be taken to prevent the pendulum from swinging too far. Adequately controlled and judiciously applied, such new doctrines, or new applications of old doctrines, may be very beneficial to mankind. Uncontrolled or misapplied, they may be as disastrous and devastating to vested rights as a forest fire out of control. At the very inception of this so-called new doctrine a note of warning touching its application was sounded. In Fifth AvenueBank v. Compson, supra (at p. 154), this court said: *Page 176 
"But this is a power which should be sparingly used" and that "the court should not become an instrument of speculation on future property values." In United Building and LoanAssociation v. Neuman, 113 N.J. Eq. 244, we held that while the power to compel a credit on a deficiency claim was not doubted, it should be sparingly exercised. Our need is not of power, but of wisdom to use that which we have. In the last cited case we also said (at p. 245):
"The rights of a mortgagee demand the protection of this court no less than those of the mortgagor; and it is of the highest interest to the public welfare that no judicial action be taken which would render real estate mortgages less desirable as an investment, a result which quite possibly might follow from indiscriminate restraints in proceedings of this kind; and no impediment should be interposed by this court to the orderly pursuit by the holder of a mortgage of his lawful remedy for the collection of the debt thereby secured, except where necessary for the protection of a countervailing equity." See, also,Kotler v. John Hancock Insurance Co., supra.
In Maher v. Usbe Building and Loan Association, supra, and in Hillside National Bank v. Silverman, supra, we held that the Lowenstein doctrine established no general rule requiring the allowance of a credit of the fair value of the mortgaged premises sold at a foreclosure sale and that there were certain essential requirements to the invocation of the equities stated in the principal case. In Harvester Building and LoanAssociation v. Kaufherr, supra, Mr. Justice Case, speaking for the court of errors and appeals, said:
"The practice of seeking to have what is called fair value substituted for market value as evidenced by fair and open sale at the highest and best price that the property would bring in cash at the time of sale, may be made quite as oppressive to a mortgagee as it is helpful to the mortgagor; * * *" and in Rose
v. Jerome-Harvey Development Co., supra, the same distinguished justice said:
"We are not prepared to hold that in all instances the protection of a mortgagor or of an obligor on the bond against an unconscionable result would justify the court in refusing *Page 177 
to confirm unless the full fair value of the property * * * be bid or credited."
In Fidelity Union Trust Co. v. Appleby, 122 N.J. Eq. 59, we held in a similar proceeding that "defendant's petition for relief is an appeal to the conscience of the chancellor and seeks relief as a matter of grace and not of right;" and in Miller v.Bond and Mortgage Guaranty Co., 121 N.J. Eq. 197 (at p. 199), that "there is no doubt of the inherent jurisdiction of this court to give relief in matters of this kind if the circumstances justify it, but that jurisdiction is entirely discretionary, as is all of this court's inherent jurisdiction. The chancellor may exercise it or not, according as the prayer of the bill appeals to his conscience." And see Young v. Weber, supra, and cases therein cited.
I think it is clear from our decisions that there must be some unusual circumstance such as a distressing or unavoidable hardship attaching to the mortgagor and an attempt on the part of the mortgagee to seek an unconscionable advantage over his mortgage debtor to justify the invoking of the equitable doctrine of the Lowenstein Case.
In Fidelity Union Trust Co. v. Levy (not reported, Docket 115, page 20), Vice-Chancellor Kays said:
"In order to entitle the petitioners to relief it must affirmatively appear that the price at which the premises were sold was such as to shock the conscience of the court or that a nominal bid was made in the absence of competitive bidding due to some fact beyond the control of the petitioners. At a foreclosure sale it frequently happens that the property sells for less than its market value. * * * The test is not whether the property brought the full market value, but whether the price at which it was sold was such as to shock the conscience of the court."
In Mellen v. Edwards, 37 Pac. Rep. 2d 203, the Washington supreme court said:
"It must appear that the creditor has taken a selfish and unfair advantage of the situation to such an extent as to shock the conscience of the chancellor before the extraordinary powers of equity will override the statutory provisions."
And the doctrine of the Lowenstein Case requires only that *Page 178 
the mortgagee take no unfair advantage of his distressed mortgagor.
Can it be said that a mortgagee who bids what he honestly believes the mortgaged property to be fairly worth, and is content that someone else take the property at the same bid, is taking a selfish or unfair advantage of the mortgagor, or that he is guilty of such unconscionable conduct as will move the chancellor to refuse confirmation of the sale? The approach to the problem here must be far different from that in theLowenstein Case.
Is a bid of $525,000 for a property having a fair value not in excess of $600,000, under the circumstances of this case, so inadequate as to shock the conscience of the court? It seems to me that the answer to this question lies in the answer to the further question — would confirmation of this sale and the prosecution of a suit for the apparent deficiency result in a double satisfaction of the debt? Clearly not, unless the mortgagee purchaser can turn its purchase into cash in excess of the amount of its bid or retain its purchase as an investment producing an income return at the contractual rate on a sum substantially in excess of the amount of the bid.
I have already indicated that there is no present market or prospect of a market in the near future for the sale of this property; and that as a permanent investment it does not at present yield an income on a sum in excess of $535,600, and that it is not likely in the future to yield an income as a permanent investment upon a sum in excess of $600,000. Under these circumstances, it does not appear to me that the complainant's bid of $525,000 is an unconscionable bid or that complainant is either seeking or can obtain a double satisfaction of its debt by a retention of the mortgaged premises and a prosecution of its deficiency claim after crediting upon its decree the amount of its bid.
As already suggested, no infallible rule can be laid down indicating the allowable spread between bid and fair value which will result in confirmation. Each case must stand upon its own bottom. Cf. Fidelity Union Trust Co. v. Pasternack, 122 N.J. Eq. 180; affirmed, 123 N.J. Eq. 181; Fidelity Union Trust Co. v.Dreyfuss, supra; National Mortgage *Page 179 Corp. v. Deering, 121 N.J. Eq. 274; Ukrainian NationalAssociation v. Linden Supply Co., Inc., 124 N.J. Eq. 400;Fidelity Union Trust Co. v. Feibleman Lehman (unreported, Docket 101, page 218); Fidelity Union Trust Co. v. SchlengerRealty Co. (unreported, Docket 116, page 652); Fidelity UnionTrust Co. v. Levy, supra. But I have no hesitancy in saying that the difference between the amount of complainant's bid and the fair value as fixed by this court in this case does not justify refusal of confirmation of the sale.
In Morrisse v. Inglis, 46 N.J. Eq. 306, cited in theLowenstein Case, the court of errors and appeals said that it is "of the greatest importance to encourage bidding by giving to every bidder the benefit of bids made in good faith and without collusion or misconduct, and, at least, when the price offered is not unconscionably below the value of the property;" and inRyan v. Wilson, 64 N.J. Eq. 797, the same court said that "this rule * * * rests upon the grounds of public policy." And it cannot be denied that the complainant's bid was made in good faith and without collusion or misconduct.
I will advise a decree in accordance with these conclusions.