(834 P.2d 1365)
No. 66,941

THE OLATHE BANK, formerly THE OLATHE STATE BANK, *Appellee,*
v. MORTON MANN and GERALDINE L. MANN, and THE LOIRET,
.A FRENCH VILLAGE, INC., *Appellants.*

Opinion filed June 5, 1992.

*Ron Bodinson,* of Shook, Hardy & Bacon, of Overland Park, and *Scott McCandless,* of the same firm, of Kansas City, Missouri, for appellants.

*Frederick B. Farmer,* of Lowe, Farmer, Bacon & Roe, of Olathe, for appellee.

Before LARSON, P.J., GERNON, J., and RICHARD B. WALKER, District Judge, assigned.

GERNON, J.: This is an appeal from the confirmation of a sheriff's sale in a foreclosure action. Specifically, Morton and Geraldine Mann contend that the bid approved by the court was substantially less than the "fair value" of the property and represents a liquidation value or recovery value.

A full recitation of the history of the dealings between the Manns and the Olathe Bank (the Bank) is necessary here to comprehend the present case and our conclusion.

In the early 1980s, the Manns, through a corporation known as The Loiret, A French Village, Inc., (Loiret) began the development of a large tract of real estate in Lenexa. In the mid-1980s, the Manns and Loiret borrowed $500,000 from the Olathe State Bank, giving a mortgage on 5.8683 acres. The property is on 87th Street, east of I-435, and touches Bourgade Avenue. At the time of the original bank loan in 1986, an excavation hole was present on the property.

In 1988, the Manns sold part of the tract now in question for $317,925, or $4.50 per square foot. The Olathe State Bank released its lien on the tract sold in consideration for the payment of $140,000 on the debt. With this sale, the debt was reduced to $360,000. The remaining collateral was an L-shaped tract consisting of 4.246 acres or 184,973 square feet. The remaining tract fronted 87th Street for about 240 feet and Bourgade Avenue for 256 feet. A medical facility was built on the 1.75 acres which were sold.

In February of 1989, the Manns borrowed another $100,000, secured by the remaining 4.246 acres, thereupon increasing their debt principal to $460,000. They signed a 60-day renewal note in March of 1990 and paid interest on extensions through September 4, 1990. In September of 1990, ownership of the Olathe State Bank changed, and the new owners granted no further extensions. In November of 1990, the Bank commenced foreclosure proceedings.

In March of 1991, the trial court entered judgment of foreclosure for $460,000 principal; interest of $1,663.53 as of September 14, 1990, and continuing to accrue at 12% per annum; $200 for title costs; and court costs. The property was ordered sold at a sheriff's sale. The amount owed the Bank by the Manns at the time of the sheriff's sale, including accrued interest, was $497,553.81.

A sheriff's return was filed on May 15, 1991, indicating the property was purchased by the Bank for $361,000, leaving a deficiency of $154,587.13, plus judgment interest at 12%.

On June 20, 1991, three witnesses testified at a confirmation hearing. Kenny Meyers had appraised the property at the request of the Bank. He stated the market value of the property to be $500,000 or $2.75 per square foot. His estimate considered a marketing period of two to three years, the highest and best use of the property, and a deduction from the value of $69,500 to $180,000 for the cost of filling the hole on the property.

Whether the hole is an asset or liability is at issue. If a buyer wanted to place a building on the location where the hole is, the cost of excavation would be greatly reduced. On the other hand, should a buyer want the space level, the hole becomes an expense.

The Bank's president testified as to the basis for its bid. The Bank assumed a three-year holding period and, based upon such an assumption, calculated $19,000 in tax liabilities, $90,000 in lost interest income, and a $30,000 real estate sales commission. At the same time, the president conceded the accuracy of the $500,000 market value appraisal.

Another witness was Bill Kiesling, a commercial real estate agent. Kiesling testified that the most recent listing for the property, prior to foreclosure, was $5.25 per square foot, although

four comparable tracts sold $.50 to $1.00 less than the list price, and that $4.75 to $5.00 per square foot was reasonable. He stated that, even with a two- to three-year marketing period, he would expect a sale of $4.50 to $4.90 per square foot. Simple mathematics shows that, at $4.50 per square foot, the property would sell for over $832,000.

The trial court confirmed the sheriff's sale. The Manns appeal. We are required to determine whether, under these facts and circumstances, the trial court abused its discretion when it approved the sale.

K.S.A. 1991 Supp. 60-2415 governs the confirmation of a sheriff's sale and provides:

"(a) *Certificate of purchase.* The sheriff shall at once make a return of all sales made under this article to the court. All taxes due or delinquent shall be noted on the sheriff's return. If the court finds the proceedings regular and in conformity with law and equity, it shall confirm the same, direct the clerk to make such entry upon the journal and order the sheriff to make to the purchaser the certificate of sale or deed provided for in this article.

"(b) *Equity powers of court.* The court may decline to confirm the sale where the bid is substantially inadequate, or in ordering a sale or a resale, may, in its discretion, if conditions or circumstances warrant and after a proper hearing, fix a minimum or upset price at which the property must be bid in if the sale is to be confirmed; or the court may, upon application for the confirmation of the sale, if it has not theretofore fixed an upset price, conduct a hearing to establish the value of the property, and as a condition to confirmation require the *fair value of the property* be credited upon the judgment, interest, taxes and costs. A sale for the full amount of the judgment, taxes, interest and costs shall be deemed adequate." (Emphasis added.)

This court recently reiterated, "The statute gives the trial court the discretion to refuse to confirm the sale if it finds the bid substantially inadequate." *Federal Land Bank of Wichita v. Cummings,* 12 Kan. App. 2d 134, 137, 735 P.2d 1110 (1987). See *Broughton v. Murphy,* 155 Kan. 454, 456, 126 P.2d 207 (1942); *Liberty Savings & Loan Ass'n v. Hanson,* 145 Kan. 174, 175, 64 P.2d 609 (1937).

In *Cummings,* this court also concluded:

"The evidence determines whether the trial judge confirms the sale or takes one of the following actions: (1) The trial court need not confirm the sale if it finds the bid is 'substantially inadequate,' in which case it would order

a resale; or (2) the trial court may give the creditor the option of either giving the debtor credit upon the judgment, interest, taxes, and costs for the value of the property, as determined by the trial judge, or reselling. Whether the trial court confirms the sale, orders a resale because the highest bid is 'substantially inadequate,' or gives the judgment holder an option, the decision must be supported by the record." 12 Kan. App. 2d at 138.

See *Liberty Savings & Loan Ass'n v. Jones*, 143 Kan. 422, 425, 54 P.2d 937 (1936) (implying a competent evidence or substantial evidence standard).

No published Kansas case defining "fair value" in the foreclosure sale context has been found. Other jurisdictions have considered this issue in this context. Also, we must determine whether liquidation value or recovery value is "fair value" under the facts of this case.

In *Rainer Mortgage v. Silverwood, Ltd.*, 163 Cal. App. 3d 359, 209 Cal. Rptr. 294 (1985), the court offered the following analysis of the term:

"*Nelson v. Orosco* [, 117 Cal. App. 3d 73, 172 Cal. Rptr. 457 (1981),] simply holds that 'fair value' must be determined in light of the property's marketability at the time of the sale. It does not equate 'fair value' with 'fair *foreclosure* value,' as urged by Rainer." 163 Cal. App. 3d at 364.

"The 'fair value' of foreclosed property is thus its intrinsic value. Under normal conditions this intrinsic value will often coincide with its fair market value; the value a willing purchaser will pay to a willing seller in an open market. [Citation omitted.] This correlation is not fixed, however, and market value is only one factor the court should consider when determining 'fair value.' As discussed in *Nelson v. Orosco, supra,* 117 Cal. App. 3d 73, 'fair value' is to be determined by all of the circumstances affecting the intrinsic value of the property at the time of the sale. This necessarily excludes the circumstances of the foreclosure sale. These are not factors that affect the intrinsic worth of the property. . . . Accordingly, we conclude the Legislature intended that 'fair value,' as used in Code of Civil Procedure section 726, subdivision (b), be construed as the intrinsic value of real property subject to judicial foreclosure, taking into consideration all the circumstances affecting the underlying worth of the property at the time of the sale, without consideration of the impact of foreclosure proceedings on this value." 163 Cal. App. 3d at 366-67.

The court concluded: "Construing the phrase 'fair value' in Code of Civil Procedure section 726, subdivision (b) as taking into consideration all the disabilities attending a foreclosure sale would be unreasonable, because it would permit the lender the double

recovery the statute was intended to prevent." 163 Cal. App. 3d at 369-70.

In *Fidelity Union Trust Co. v. Ritz Holding Co.*, 126 N.J. Eq. 148, 166-67, 8 A.2d 235 (1939), the court analyzed the term as follows:

"In my judgment, fair value for the purposes of the instant proceeding is that sum which the mortgagee purchaser ought, under all the circumstances, reasonably expect to realize from the acquired premises either by way of sale in the near future or upon the basis of a permanent investment. . . .

"In estimating this value, however, effect should be given to potential value and all other elements having any bearing upon fair value, including replacement cost, neighborhood influence and trend."

In *Federal Land Bank of St. Paul v. Bergquist*, 425 N.W.2d 360, 363-64 (N.D. 1988), the court adopted the analysis of the *Rainer* court concerning "fair value." The court concluded:

"We agree with the California court that the legislative protection afforded a foreclosed mortgagor does not depend upon the vagaries of the market-place. We believe that the Legislature intended 'fair value' to have a broadly defined meaning, embracing many factors. We conclude that 'fair value' means the value of the property which will produce a fair and equitable result between the parties.

"[A]ll evidence bearing on the value of the property and the circumstances of the underlying transaction can be presented to the jury. This would include, among other things, the amount of the mortgage, the amount of any subsequent mortgage, fluctuations in land values, and the remaining amount claimed to be due on the debt. Market value is, of course, admissible as one factor for consideration by the jury, but it is not controlling." 425 N.W.2d at 364.

See *Schiele v. First Nat. Bank of Linton*, 436 N.W.2d 248, 249 (N.D. 1989) (holding "fair value" is not synonymous with "fair market value").

The Wisconsin courts have analyzed the term "fair value" on several occasions. In *Kremer v. Rule*, 216 Wis. 331, 338-39, 257 N.W. 166 (1934), the court indicated:

" 'Market value,' as ordinarily defined, can have little, if any, application to a mortgage foreclosure sale where obviously the defendant mortgagor is forced to sell and where the plaintiff mortgagee, in the absence of other bidders, is obliged to bid if the foreclosure sale is to be consummated. So when a court is determining 'real value of the premises' for the purpose of giving to the mortgagee the option to credit the amount thereof on the foreclosure judgment as a condition precedent to confirmation of a mortgage foreclosure sale which has already taken place upon a bid deemed by the

court to be substantially inadequate, it should not consider 'market value' as that expression is ordinarily used and understood, much less the value that the premises may have had at some remote time or may have in the future if the prices obtainable for farm products prevalent during such past remote period shall again prevail.

. . . .

" 'Real value of the premises,' as used in the *Suring Case*, should approximate that price which a person willing and able to buy the property would reasonably pay for it, not for purposes of speculation, but for that use to which it has been or reasonably may be put."

In *Northwestern Loan & Trust Co. v. Bidinger*, 226 Wis. 239, 245-46, 276 N.W. 645 (1937), the court summarized prior Wisconsin case law on this issue:

"From these holdings, it is apparent that 'fair value,' as used in our cases and which we have held that a court, in the exercise of its equitable powers, may require a mortgagee to credit upon the mortgage indebtedness as a condition of immediate confirmation, is that amount which, under all of the circumstances of a given case, will not shock the conscience of the court. A bid which, under all of the circumstances, is grossly insufficient or unconscionably inadequate and which, if credited upon the mortgage indebtedness, would operate as a great injustice to the mortgagor, does not, of course comply with the concept embodied in the term 'fair value.' 'Fair value' obviously does not mean 'market value,' as that term is generally understood, or that value which the property may probably have in the future under more favorable economic conditions, or that value which it may have if the property be remodeled and put to other or more extensive uses which possibly may prove more profitable."

See *Cameron v. Heinze*, 231 Wis. 479, 486, 286 N.W. 47 (1939).

The Wisconsin Supreme Court reaffirmed these earlier definitions in *First Wis. Nat. Bank of Oshkosh v. KSW Inv.*, 71 Wis. 2d 359, 365-67, 238 N.W.2d 123 (1976).

In *First Financial Sav. Ass'n v. Spranger*, 156 Wis. 2d 440, 445, 456 N.W.2d 897 (Ct. App. 1990), the trial court rejected a bid which was calculated by deducting "the cost of selling, holding, or carrying the property while a buyer is sought" from the estimated market value. 156 Wis. 2d at 444. The Wisconsin Court of Appeals affirmed, reasoning:

"While 'fair value' is not the same as 'market value,' [citation omitted] it is a value determined by the property's sale value. [Citation omitted.] The circuit court may consider the cost of selling, holding or carrying the property while a buyer is sought only to the extent these factors affect the sale value.

First Financial did not present evidence to the circuit court that such factors affected the sale value.

. . . .

"Foreclosure proceedings are equitable in nature. [Citation omitted.] First Financial's approach may allow it to reap a windfall at Spranger's expense. It may sell the property immediately, without a broker's commission, and without incurring any holding or carrying costs. First Financial does not offer, if that should occur, to reimburse Spranger. That result is inequitable.

"We do not foreclose the circuit court from considering that the mortgaged property is the subject of foreclosure proceedings. The inquiry must be, however, what an able and willing buyer will reasonably pay for the property for the use to which the property has been or reasonably may be put. [Citation omitted.]" 156 Wis. 2d at 444-45.

Although prior Kansas cases do not define "fair value," they provide some guidance as to the equitable guidelines our Supreme Court has announced.

In *Kaw Valley State Bank v. Chumos*, 138 Kan. 714, 715-16, 27 P.2d 244 (1933), the assessed taxation value of the property was between $4,440 and $5,000; the appraised value was between $12,690 and $13,650. The trial court entered a finding that the property " 'does not now have a value exceeding one-third of' " the appraised value, or approximately $4,230. 138 Kan. at 716. The trial court confirmed the sale for a bid of $2,000. The Kansas Supreme Court reversed, concluding the sale "was not made in conformity with equity." 138 Kan. at 719. At that time, the "substantially inadequate" and "fair value" language had just been added to the statute and was not considered in deciding the case. 138 Kan. at 719.

In *Broughton v. Murphy*, 155 Kan. at 455, the trial court determined the reasonable value of the property was $2,500 and refused to confirm a sale for $800. The Kansas Supreme Court affirmed. 155 Kan. at 457.

We reject the conclusion of the trial court which equates fair value with the speculative holding costs of the Bank here. To accept the Bank's position would be to accept the Bank having the property with an admitted fair market value of $500,000 to $832,000, and a deficiency against the Manns of $154,587.13, after having been paid $140,000 in principal and over $200,000 in interest by the Manns.

The trial court had before it some evidence of speculative expenses and holding periods, as well as some evidence as to "fair market value." It had no evidence based on a proper definition of "fair value," other than the appraiser's testimony, which focused on a different question.

We are, therefore, required here to reverse the trial court, not only because the bid was based upon the inequity of allowing the Bank to bid at its estimated "recovery" rate, but also because the trial court had before it no evidence as to "fair value" under the circumstances.

We reverse the order confirming the sale and remand to the trial court with directions to hold a hearing on the motion to confirm the sale. At such a hearing, each side should be given the opportunity to present evidence to establish the "fair value" of the property consistent with the definitions cited here.

Reversed and remanded.