No. 66,941

THE OLATHE BANK, formerly THE OLATHE STATE BANK, *Appellee,*
v. MORTON MANN and GERALDINE L. MANN, and THE LOIRET,
a French Village, Inc., *Appellants.*

(845 P.2d 639)

Opinion filed January 22, 1993.

*Ron Bodinson,* of Shook, Hardy & Bacon, of Overland Park, argued the cause, and *Scott McCandless,* of the same firm, of Kansas City, Missouri, was with him on the brief for appellants.

*Frederick B. Farmer,* of Lowe, Farmer, Bacon & Roe, of Olathe, argued the cause and was on the brief for appellee.

*Charles N. Henson,* of Davis, Wright, Unrein, Hummer & McCallister, of Topeka, was on the brief for *amicus curiae* The Kansas Bankers Association.

The opinion of the court was delivered by

HERD, J.: The Olathe Bank filed this real estate mortgage foreclosure action against Morton Mann; his wife, Geraldine L. Mann; and The Loiret, A French Village, Inc. (The Loiret). Following the sheriff's sale of the mortgaged property where the mortgagee bank was the purchaser, the trial court confirmed the sale pursuant to K.S.A. 1991 Supp. 60-2415. The Manns appealed to the Court of Appeals, which reversed the trial court. *Olathe Bank v. Mann,* 17 Kan. App. 2d 112, 834 P.2d 1365 (1992). We granted the Bank's petition for review.

The facts disclose that in the early 1980's the Manns, through their corporation, The Loiret, began the development of a large tract of real estate in Lenexa. In 1986, the Manns borrowed $500,000 from the Olathe State Bank, now the Olathe Bank (Bank). As security for the note, the Manns gave a first mortgage to the Bank on 5.8683 acres of undeveloped real estate in Lenexa. The property is located on 87th Street, east of I-435, and touches Bourgade Avenue. There is a large excavation on the property which was there when the loan was made.

In 1988, the Manns sold part of the tract for $317,925, which is $4.50 per square foot. The Bank released its lien on the tract sold in consideration of the payment of $140,000. Thus, the debt was reduced to $360,000. The remaining collateral was an L-shaped tract consisting of 4.246 acres (184,973 square feet). This tract fronted 87th Street for about 240 feet and Bourgade Avenue for 256 feet. A medical facility was built on the severed 1.75 acres.

In February 1989, the Manns borrowed another $100,000, secured by the remaining acres, increasing their debt to $460,000. They signed a 60-day renewal note in March 1990 and paid interest on extensions through September 4, 1990. In September 1990, ownership of the Olathe State Bank changed, and the new owners granted no further extensions. In November 1990, the Bank commenced foreclosure proceedings.

In March 1991, the trial court entered judgment of foreclosure for the $460,000 principal; interest of $1,663.53 as of September 14, 1990, and continuing to accrue at 12% per annum; $200 for title costs; and court costs. The property was sold at a sheriff's sale in May 1991. At the time of the sheriff's sale, the Manns owed the Bank $497,553.81, including accrued interest. The mortgagee Bank made the only bid at the sale and purchased the property for $361,000. Of that amount, $342,966.68 was applied to the judgment, the rest being used to pay court costs and taxes. This left a deficiency judgment of $154,587.13, which draws judgment interest at 12%.

A hearing to consider confirmation of the sale was held in June 1991. Three witnesses testified. The first witness was Kenny Meyers, SRA, Associate Appraiser of Bliss Associates, Inc., who appraised the property for the Bank. Much of Meyers' testimony reiterated the information found in a written report he prepared, which stated in part:

"Summary and Conclusion of Sales Comparison Approach
The comparable sales provide an adjusted value range for the subject site of $2.57 to $3.40 per square foot. Excluding Sale No. 3, the indicated value range narrows considerably to $2.57 to $2.76 per square foot. Therefore, it is my opinion that an indicated value by the Sales Comparison Approach of $2.75 per square foot is reasonable for the subject calculated as follows:
184,973 (SF) × $2.75/SF = $508,675
VALUE ESTIMATE: SALES COMPARISON APPROACH $500,000."

Meyers' report also contained the following cover letter to the Bank:

"April 16, 1991
Ms. Sandy Dawson
Assistant Vice President
The Olathe Bank
P.O. Box 428
Olathe, Kansas 66061

Dear Ms. Dawson:

The appraisal you requested is enclosed. Subject to limiting conditions it estimates market value of
**Vacant Commercial Site**
**SWQ 87th Street and Bourgade**
**Lenexa, Kansas.**

Legal interest is the fee simple estate as if unencumbered. Final value estimate as of April 12, 1991, is

$500,000.

Thank you for choosing Bliss Associates, Inc.

Sincerely,
Bliss Associates, Inc.

By:

  Kenny Meyers, SRA
  Associate Appraiser"

Meyers testified it was his opinion the excavation was a detriment to the future resale of the property and that he discounted his appraised value to take care of the cost of filling the hole in an amount ranging from $69,500 to $180,000. He, however, had not discounted the value for taxes, future lost interest, or sales commissions, indicating to do so would be improper appraisal. He further testified the highest and best use of the property would be to hold for future development as an office building site, which might take two to three years. Then this colloquy followed:

"Q.: (By Mr. Farmer) . . . Well, in any event, did you discount the fair market value that you have given us to $2.75 a foot due to your forecast of the two to three year holding period?

"A. [Mr. Meyers] No, I did not.

"Q.: Why not?

"A.: Because that's common, contrary to the market value as contained in the report.

"Q.: And you've included in these, the reasons for your report?

"A.: Yes.

"Q.: Have you not?

"A.: Why it [sic] basically to discount that value, an estimate value implies a reasonable marketing period of which we forecast was in the front basically is what we're saying. We have estimated a market value but we have said that it might take two or three years to achieve it because the market is very stagnant at this time. To discount a value, no longer reflects the market value, implies liquidation value or a quote, 'quick sale' value."

The Bank's President, Thomas J. Davies, testified as to the basis for the Bank's bid. Davies conceded the $500,000 market value appraisal was accurate. The Bank assumed it would take three years to sell the property. In arriving at its bid, the Bank assumed a three-year holding period and based upon that as-

sumption calculated $19,000 in future tax liabilities, $90,000 in future lost interest income, and a future $30,000 real estate sales commission. Thus, the Bank arrived at its bid of $361,000 ($500,000 − 19,000 − 90,000 − 30,000 = $361,000). Davies also considered the excavation a detriment to selling the property. He testified he had received bids ranging from $100,000 to $250,000 for filling the hole.

On cross-examination of Davies, this exchange occurred:

"Q. [By Mr. Bodinson] Again, I think I pretty well understood your approach to your bid, but basically, don't want to put words in your mouth, but what you're doing, is you're acknowledging the fair market value of the property as of now, to [be] about $500,000, maybe $508,000; and then you're anticipating in order to arrive at your bid, what might occur in the next three years as far as your holding the property and having responsibility for taxes and whatnot?

"A. [By Mr. Davies] Correct.

. . . .

"Q. [By Mr. Bodinson] All right. But basically, your . . . entire impact here of why you didn't bid your judgment or at least fair, the fair market value of $508,000 is anticipating future loss of use of money that has been converted to land?

"A. [Mr. Davies] Yes.

"Q.: Okay. Has nothing to do, I mean, you might sell this on July 16th [1991], correct?

"A.: Possibly.

. . . .

"Q. [Mr. Bodinson] Uh-huh. Well, you believe the property is worth $508,000 today, don't you?

"A. [Mr. Davies] Based on the appraisal, yes."

The Manns called Bill Kiesling as their witness on value. Kiesling, a commercial real estate agent who had listed the Manns' property for sale for the previous three and one-half years, testified the property had been listed at $5.25 per square foot. Kiesling stated properties are usually listed at a higher price than they are expected to be sold to allow negotiation of the sale price. He stated that, even with a two- to three-year marketing period, he would expect a sale at $4.50 to $4.90 per square foot. Assuming the property sold at $4.50 per square foot, the total selling price would be over $832,000. He based his opinion on the sale of a portion of the same tract just two years before at $4.05 per square foot. Kiesling testified that although it could take two years to

sell the property, the property might be sold within three months and it was impossible to know when the property might be sold. Kiesling admitted the Manns had not received any offers for the property from 1989 to 1991.

Kiesling testified that on a couple of occasions prospective buyers were interested in the property because of the excavation. Depending upon what the buyer planned to construct on the property, the excavation could be a positive factor rather than a detriment. Kiesling had investigated the cost of filling in the excavation and received an estimate of $90,000.

After considering the evidence presented at the confirmation hearing, the trial court found the Bank's highest and best use of the property is to hold it for sale for possible future development, which could exceed two to three years. The trial court also found the appraised market value was $500,000 and that $361,000 is a fair value for the property. Furthermore, the sale price, which included partial satisfaction of the Bank's judgment in the sum of $342,966.68, is not substantially inadequate. The trial court granted the Bank a deficiency judgment in the sum of $154,587.13 against the Manns.

The Manns appealed to the Court of Appeals, which reversed the trial court's finding that the Bank's bid is the fair value of the property, pursuant to K.S.A. 1991 Supp. 60-2415. That statute provides:

"(a) *Certificate of purchase.* The sheriff shall at once make a return of all sales made under this article to the court. All taxes due or delinquent shall be noted on the sheriff's return. If the court finds the proceedings regular and in conformity with law and equity, it shall confirm the same, direct the clerk to make such entry upon the journal and order the sheriff to make to the purchaser the certificate of sale or deed provided for in this article.

"(b) *Equity powers of court.* The court may decline to confirm the sale where the bid is substantially inadequate, or in ordering sale or a resale, may, in its discretion, if conditions or circumstances warrant and after a proper hearing, fix a minimum or upset price at which the property must be bid in if the sale is to be confirmed; or the court may, upon application for the confirmation of the sale, if it has not theretofore fixed an upset price, conduct a hearing to establish the value of the property, and as a condition to confirmation require the *fair value of the property* be credited upon the judgment, interest, taxes and costs. A sale for the full amount of the judg-

ment, taxes, interest and costs shall be deemed adequate." (Emphasis added.)

The Court of Appeals found "fair value" had not previously been defined in the foreclosure sale context. The Court of Appeals then reviewed several cases from other jurisdictions that defined fair value. Finally, the Court of Appeals stated:

"We reject the conclusion of the trial court which equates fair value with the speculative holding costs of the Bank here. To accept the Bank's position would be to accept the Bank having the property with an admitted fair market value of $500,000 to $832,000, and a deficiency against the Manns of $154,587.13, after having been paid $140,000 in principal and over $200,000 in interest by the Manns.

"The trial court had before it some evidence of speculative expenses and holding periods, as well as some evidence as to 'fair market value.' It had no evidence based on a proper definition of 'fair value,' other than the appraiser's testimony, which focused on a different question.

"We are, therefore, required here to reverse the trial court, not only because the bid was based upon the inequity of allowing the Bank to bid at its 'recovery' rate, but also because the trial court had before it no evidence as to 'fair value' under the circumstances." 17 Kan. App. 2d at 119-20.

The sole issue for appellate review is whether the trial court erred in confirming the sale and entering a deficiency judgment against the Manns.

In *Federal Land Bank of Wichita v. Cummings*, 12 Kan. App. 2d 134, 735 P.2d 1110 (1987), the Court of Appeals construed K.S.A. 60-2415(b) as giving the trial court three options. These options are: (1) confirm the sale if the bid is substantially adequate; (2) order resale of the property if the bid is substantially inadequate; (3) give the creditor the option of either giving the debtor credit upon the judgment, interest, taxes, and costs for the value of the property; or reselling. 12 Kan. App. 2d at 138. Furthermore, if the sale is confirmed, the trial court has no discretion in whether to enter a deficiency judgment. The amount of a deficiency judgment is merely a mathematical calculation. 12 Kan. App. 2d at 138.

The Manns argue fair value was inserted into K.S.A. 1991 Supp. 60-2415 to protect the debtor. Otherwise, the lender could be unjustly enriched by purchasing the property at a low price at the sheriff's sale and also receiving a large deficiency judgment

against the mortgagor. The Manns contend the trial court did not find fair value but instead applied liquidated or recovery value based upon speculation and illogical losses. More specifically, the Manns contend the Bank's reduction of the $500,000 market price by the projected property taxes for three years, the real estate agent's commission of $30,000, and $90,000 for the lost use of the money while the property is held for sale violates the spirit of K.S.A. 1991 Supp. 60-2415(b). The Manns point out the deduction of $90,000 for lost use of the money tied up in owning the property is improper because they have been ordered to pay 12% interest per year on the deficiency judgment of $154,000, thus giving the Bank double interest on that amount.

Although no Kansas case has defined fair value, some Kansas cases provide guidance. For example, in *Broughton v. Murphy*, 155 Kan. 454, 126 P.2d 207 (1942), the trial court determined the reasonable value of the property was $2,500 and refused to confirm a sale for $800. We affirmed. 155 Kan. at 455, 457. In *Liberty Savings & Loan Ass'n v. Jones*, 143 Kan. 422, 425, 54 P.2d 937 (1936), the trial court heard conflicting evidence of the property's value at a confirmation hearing. The trial court determined the bid was "substantially the real value of the property" and confirmed the sale. We found abundant competent evidence to support that finding and refused to reverse the trial court. In contrast, in *Liberty Savings & Loan Ass'n v. Hanson*, 145 Kan. 174, 175-76, 64 P.2d 609 (1937), we reversed the trial court and ordered confirmation because there was "no substantial disparity between the actual value of the property and the selling price at the sale in foreclosure" and there was no irregularity in the proceedings.

Other jurisdictions have defined fair value. The California Court of Appeal discussed fair value in *Rainer Mortgage v. Silverwood, Ltd.*, 163 Cal. App. 3d 359, 209 Cal. Rptr. 294 (1985). In that case the court stated:

"*Nelson v. Orosco* [, 117 Cal. App. 3d 73, 172 Cal. Rptr. 457 (1981),] simply holds that 'fair value' must be determined in light of the property's marketability at the time of sale. It does not equate 'fair value' with 'fair *foreclosure* value,' as urged by Rainer." 163 Cal. App. 3d at 364.

"The 'fair value' of foreclosed property is thus its intrinsic value. Under normal conditions this intrinsic value will often coincide with its fair market

value; the value a willing purchaser will pay to a willing seller in an open market. [Citation omitted.] This correlation is not fixed, however, and market value is only one factor the court should consider when determining 'fair value.' As discussed in *Nelson v. Orosco, supra,* 117 Cal. App. 3d 73, 'fair value' is determined by all of the circumstances affecting the intrinsic value of the property at the time of the sale. This necessarily excludes the circumstances of the foreclosure sale. These are not factors that affect the intrinsic worth of the property. . . . Accordingly, we conclude the Legislature intended that 'fair value,' as used in Code of Civil Procedure section 726, subdivision (b), be construed as the intrinsic value of real property subject to judicial foreclosure, taking into consideration all the circumstances affecting the underlying worth of the property at the time of the sale, without consideration of the impact of foreclosure proceedings on this value." 163 Cal. App. 3d at 366-67.

Ultimately, the court found: "Construing the phrase 'fair value' in Code of Civil Procedure Section 726, subsection (b) as taking into consideration all the disabilities attending a foreclosure sale would be unreasonable, because it would permit the lender the double recovery the statute was intended to prevent." 163 Cal. App. 3d at 369-70.

In contrast, the New Jersey Court of Chancery has stated:

"It is next to impossible to provide a definition or formula for such value which can be uniformly applied to all cases, and of necessity each case as it arises will depend upon its own special circumstances, and will be a law unto itself. . . .

". . . It is not market value, for this proceeding assumes that there was no market. It is not reconstruction or replacement value, because costs seldom reflects value and especially is this so with investment property; it is not so-called 'real value;' it is not intrinsic value; nor necessarily income value alone; nor potential value, nor 'the highest and best price that the same would then bring in cash.' In my judgment, fair value for the purposes of the instant proceeding is that sum which the mortgagee purchaser ought, under all the circumstances, reasonably expect to realize from the acquired premises either by way of sale in the near future or upon the basis of a permanent investment. . . .

"In estimating this value, however, effect should be given to potential value and all other elements having any bearing upon fair value, including replacement cost, neighborhood influence and trend.

". . . Certainly there was no market at the time of that sale, otherwise the parties would not be here. And there is no evidence of any market for the property now. It would seem, therefore, that the complainant is destined to hold the mortgaged premises as an investment for an indefinite period of time. The mortgagee who has been compelled to purchase the pledge and retain it as an investment should not be expected to retain it at a

continuing loss, and equity to the mortgagor does not require that he do so." *Fidelity Union Trust Co. v. Ritz Holding Co.*, 126 N.J. Eq. 148, 165-67, 8 A.2d 235 (1939).

The court specifically held the judgment creditor, when determining its bid, could deduct its loss of interest earnings on the funds it would use to purchase the real estate. 126 N.J. Eq. at 171.

More recently, the New Jersey Superior Court has stated:

"Under the doctrine of [*Federal Title, & C., Guaranty Co. v. Lowenstein*, 113 N.J. Eq. 200, 166 A. 538 (1933)], the applicant for 'fair value' credit must show:

'(1) sale at an unconscionable figure; or (2) at a nominal bid plus the absence of competitive bidding due to some fact beyond the control of the petitioner . . .; (3) the existence of an emergency because of which the defendant was unable to protect himself by refinancing or otherwise; and (4) his own ability—lack of financial resources—to protect himself at the sale.' " 79-83 *Thirteenth Ave., Ltd. v. DeMarco*, 79 N.J. Super. 47, 58-59, 190 A.2d 391 (1963) (quoting *Young v. Weber*, 117 N.J. Eq. 242, 244, 175 A. 273 [1934]), *aff'd* 44 N.J. 525, 210 A.2d 401 (1965).

The State of Washington has a statute similar to K.S.A. 1991 Supp. 60-2415, and its Supreme Court has stated:

"The statute calls not for what the court would determine to be the *minimum value*, but rather its *fair value*. As we said in *Lee v. Barnes*, [61 Wash. 2d 581, 379 P.2d 362 (1963)], the court 'should assume the position of the competitive bidder determining a fair bid at the time of sale under normal conditions.' This means that, in deciding upon fair value at a foreclosure sale, the court may consider the state of the economy and local economic conditions, the usefulness of the property under normal conditions, its potential or future value, the type of property involved, its unique qualities, if any, and any other characteristics and conditions affecting its marketability alone with any other factors which such a bidder might consider in determining a fair bid for the mortgaged property." *Nat'l Bank v. Equity Investors*, 81 Wash. 2d 886, 926, 506 P.2d 20 (1973).

See Wash. Rev. Code § 61.12.060 (1992).

The Wisconsin courts have analyzed the term fair value on several occasions. In *First Financial Sav. Ass'n v. Spranger*, 156 Wis. 2d 440, 456 N.W.2d 897 (Ct. App.), *rev. denied* 155 Wis. 2d xxxviii (1990), the trial court refused to confirm the sheriff's sale purchase price because the buyer had determined its bid by reducing fair market value by such holding costs as the anticipated commission on the sale of the premises, maintenance costs, real

estate taxes, insurance, cost of money, and closing costs. 156 Wis. 2d at 443. The Wisconsin Court of Appeals acknowledged fair value is not synonymous with market value. Furthermore, the court stated the trial court could consider "the cost of selling, holding or carrying the property while a buyer is sought only to the extent these factors affect the sale value." 156 Wis. 2d at 444. The court also stated:

"Foreclosure proceedings are equitable in nature. [Citation omitted.] First Financial's approach may allow it to reap a windfall at Spranger's expense. It may sell the property immediately, without a broker's commission, and without incurring any holding or carrying costs. First Financial does not offer, if that should occur, to reimburse Spranger. That result is inequitable.

"We do not foreclose the circuit court from considering that the mortgaged property is the subject of foreclosure proceedings. The inquiry must be, however, what an able and willing buyer will reasonably pay for the property for the use to which the property has been or reasonably may be put." 156 Wis. 2d at 444-45.

We agree with the statement found in *Fidelity Union Trust Co.*, 126 N.J. Eq. at 165, that it is impossible to provide a formula for determining fair value which can be applied in all cases. The facts and circumstances surrounding each sale must be considered in determining the fair value at a confirmation hearing. As stated in *Nat'l Bank v. Equity Investors*, 81 Wash. 2d at 926, this means the trial court shall consider the local, long-term economic conditions; the type of property involved; its unique qualities, if any; its intrinsic worth; and other characteristics affecting the property's value.

In the case at bar, the evidence is uncontroverted that the Johnson County real estate market is depressed. The depressed market is the cause of the foreclosure action. It is further uncontroverted that the fair market value of the property on the date of sale was at least $500,000.

In the order confirming the sheriff's sale, the district court found:

"That appraisal disclosed the market value of the fee simple estate, as if unencumbered, was $500,000.00, and the Court finds this is the appraised market value of the property when considering comparable land sales with adjustments made for time and condition of sale, location/access, zoning/utility and size/topography."

In spite of the evidence and the finding of fact, the district court then found the fair value of the foreclosed property was $361,000, the amount of the Bank's bid. After deducting the amount of the outstanding taxes and court costs, the Manns were credited with $342,966.68 on the judgment, leaving a deficiency of $154,587.13.

Our problem is evident. Under K.S.A. 1991 Supp. 60-2415(b) may a mortgagee purchaser at a foreclosure sale purchase the property for less than its fair market value? Prior to 1933, mortgagees habitually bid the fair market value and purchased the mortgaged property. Because foreclosures usually occur when the real estate market is depressed, the mortgagees inequitably purchased some real bargains in the absence of competition and also obtained large deficiency judgments. To remedy this inequity, the legislature enacted R.S. 1923, 60-3463a (1933 Supp.) (now K.S.A. 1991 Supp. 60-2415[b]), with the requirement that as a condition of confirmation of such a sale if less than the full judgment, taxes, interest, and costs are bid, the fair value of the property be credited upon the judgment, interest, taxes, and costs. The effect is that the mortgagee purchaser must bid fair value. Fair value was expected at that time to be more than the depressed, distressed fair market value.

Here we have the opposite situation. The district court held the fair market value exceeds the property's fair value and permitted confirmation of a sale based on fair market value less $139,000 in anticipated taxes, interest for three years, and a real estate commission for the future sale. The confirmation's effect is that the mortgagors must pay the taxes and a real estate commission on the property they no longer own, in addition to paying a deficiency judgment bearing 12% interest. Also, they must pay 6% interest on the fair market value of the property, $500,000, while paying 12% interest on $154,587.13. Hence, the interest cost is double on the deficiency amount. Such deductions, called holding costs, are inequitable.

We agree with the California Court of Appeal's statement that the price paid for property at foreclosure should reflect the intrinsic value of the property, "taking into consideration all the circumstances affecting the underlying worth of the property at

the time of the sale," and should not be affected by the impact of the foreclosure proceedings on its value. *Rainer Mortgage v. Silverwood, Ltd.,* 163 Cal. App. 3d at 367. Allowing a mortgagee bank to reduce the purchase price due to the inherent disabilities associated with a foreclosure sale allows the mortgagee the double recovery which K.S.A. 1991 Supp. 60-2415(b) was designed to prevent. We also find the Wisconsin Court of Appeals' reasoning to be sound. That court clearly states holding costs should not be reduced from the fair market value to arrive at the sale price, except "to the extent these factors affect the sale value." *First Financial Sav. Ass'n v. Spranger,* 156 Wis. 2d at 444. In the case before us, the Bank president testified that the Bank could sell the property at any time. If the Bank did sell the property in less than three years, it would not reimburse the Manns any of the unaccrued tax or interest expense. Thus, the Bank would experience a windfall.

We conclude in a mortgage foreclosure sale of real estate, anticipated holding costs (taxes, interest, and real estate commission) are not deductible from fair market value to determine fair value of the foreclosed real estate, as a matter of law. Thus, we reverse the district court, affirm the Court of Appeals, and remand with instructions to confirm the sale on condition the Manns be credited with $500,000, the fair value of the property pursuant to K.S.A. 1991 Supp. 60-2415(b), upon the judgment, interest, taxes, and costs; otherwise a new sale be ordered.

Six, J., dissenting: I would affirm the trial court. The standard of review is abuse of discretion. This is a mortgage foreclosure confirmation of sale case. The only question is whether the trial court abused its discretion in confirming the sale. The majority states: "The sole issue for appellate review is whether the trial court erred in confirming the sale and entering a deficiency judgment against the Manns." The majority has substituted its judgment for that of the trial judge.

The majority concludes that anticipated holding costs (taxes, interest, and real estate commission) are not deductible from fair market value to determine fair value of the foreclosed real estate as a matter of law. In my view, such a holding casts a long shadow over future foreclosure actions which will inevitably involve various factual situations to be resolved by the prudent

application of a trial court's equitable powers. The majority in the case at bar is reviewing and passing upon the credibility of trial testimony. The Manns did not introduce any evidence to contradict Meyers' conclusion that a two- to three-year marketing period was likely. The Manns' witness, Kiesling, did not dispute the estimated marketing period. The Manns did not question the accuracy of the alleged losses the Bank would incur during the marketing period. During the three years Kiesling, on behalf of the Manns, had listed the property for sale, not one bid at any price had been made.

The trial court conducted a full hearing on the Bank's motion to confirm the sale. Both parties presented evidence concerning their business relations, the characteristics of the property given as collateral for the loan, the Manns' use of the property, and the property's highest and best use as of the date of the sheriff's sale. Following the hearing, the trial court made extensive findings of fact and conclusions of law in its confirmation order. Critical to the trial court's decision were its findings from the evidence that: (1) The sale was made in conformity with equity and (2) the bid was not substantially inadequate.

The majority's dual use of the terms "fair market value" and "fair value" will, in my view, endorse increased uncertainty in future K.S.A. 1991 Supp. 60-2415 actions. The majority remands, instructing the trial court to confirm the sale on the condition the Manns be credited with $500,000, an amount the majority, sitting as an appellate court, has determined to be the K.S.A. 1991 Supp. 60-2415(b) "fair value" of the property. In my view, such a "fair value" specific dollar amount determination by this court is outside of the province of appellate review. In the alternative, the majority extends to the trial judge the option of ordering a new sale.

I find no reason why the Bank should be required to bid substantially more than it would receive, based on the evidence at trial, if and when the property is resold by the Bank. Contrary to the Manns' contention, K.S.A. 1991 Supp. 60-2415(b) does not *require* the trial court to determine the "fair value" of the property. The statute gives the trial court *discretion* to make such a determination.

The standard for confirming or nonconfirming a judicial sale is stated in K.S.A. 1991 Supp. 60-2415(a), *i.e.,* whether the proceedings were "regular and in conformity with law and equity." The court "may decline to confirm the sale where the bid is substantially inadequate." K.S.A. 1991 Supp. 60-2415(b). The trial court concluded that the sheriff's sale had in all respects been made in conformity with law and equity and confirmed the sale.

The trial court concluded: "The fair value of the subject property for the purposes of the instant proceedings is that sum which the mortgagee purchaser ought, under all the circumstances, reasonably expect to realize from the acquired property by way of resale," citing *Fidelity Union Trust Co. v. Ritz Holding Co.,* 126 N.J. Eq. 148, 172, 8 A.2d 235 (1939).

The trial court found that the cost to the Bank to hold the property until such time as the property likely could be sold should be considered. Other factors also were considered in arriving at the court's determination of adequacy of the bid and whether the proceedings had been in conformity with law and equity. The trial court was free to exercise its full equity powers in determining if the sale was in conformity with law and equity. The standard for confirmation is a bid which is not "substantially inadequate" under all the circumstances.

Can it be said that no reasonable person would agree with the trial court's decision? The answer is "no." My apprehension concerning the majority opinion arises from the invitation it extends to reweigh trial testimony on appeal. The trial judge did not abuse his discretion. Substantial evidence supports the trial court's finding that the Bank's bid was not substantially inadequate. The evidence is uncontroverted that it could take three years to sell the property. The trial court, in the exercise of its equity power, reasoned that it is not equitable to force the Bank to pay the costs of holding property it was forced to buy.

The majority agrees with the statement in *Fidelity Union Trust Co. v. Ritz Holding Co.,* 126 N.J. Eq. at 165, that it is impossible to provide a formula for determining fair value which can be applied in all cases. The facts and circumstances surrounding each sale must be considered in determining the fair value at a confirmation hearing. The majority invokes the signal advanced in *Nat'l Bank v. Equity Investors,* 81 Wash. 2d 886, 926, 506 P.2d

20 (1973), that the trial court shall consider the local, long-term economic conditions; the type of property involved; its unique qualities, if any; its intrinsic worth; and other characteristics affecting the property's value. The trial court, in the case at bar, applied the teachings of *Ritz Holding Co.* and *Equity Investors.*

Perhaps, if sitting as a trial judge, I might not have evaluated the evidence exactly as the trial judge did; however, there is substantial evidence in the record to support the trial judge's resolution of the instant controversy. *Liberty Savings & Loan Ass'n v. Jones,* 143 Kan. 422, 425, 54 P.2d 937 (1936).

MCFARLAND, J., joins the foregoing dissenting opinion.