NOT DESIGNATED FOR PUBLICATION

No. 116,109

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CENTRAL NATIONAL BANK,
*Appellee*,

v.

ESTATE OF ANNITA LOU WEBER,
*Appellant*,

and

KENNETH WALSH as Successor Trustee of UNILDA MOFFATT TRUST
and Administrator of the ESTATE OF UNILDA MOFFATT,
*Appellee.*

MEMORANDUM OPINION

Appeal from Harvey District Court; JOHN E. SANDERS, judge. Opinion filed December 22, 2017.
Affirmed in part, reversed in part, dismissed in part, and remanded with directions.

*Levi H. Goossen*, of Goossen Law Office, of Newton, for appellant.

*Randall J. Pankratz* and *David J. Stucky*, of Adrian & Pankratz, P.A., of Newton, for appellee
Central National Bank.

*William P. Tretbar* and *Adam R. Burrus*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of
Wichita, for appellee Kenneth Walsh.

Before ATCHESON, P.J., MALONE and POWELL, JJ.

1

PER CURIAM: This is a mortgage foreclosure action in which Central National Bank seeks the judicially ordered sale of a 20-acre parcel of land, including a residence and outbuildings, in rural Harvey County. Bill Weber, as the executor of the Estate of Annita Lou Weber, has vigorously contested the sale. In a series of rulings, the Harvey County District Court cleared the way for the foreclosure sale and set conditions of the sale. Bill Weber has appealed. We affirm the district court with the exception of secondary rulings allocating the costs of the private sale and awarding attorney fees to CNB. We affirm in part, reverse as to the costs of the sale, dismiss as to the attorney fees, and remand for further proceedings.

## INTRODUCTORY FACTUAL AND PROCEDURAL SETTING

The recent ownership of the land involves a few twists and turns. But that history informs some of the issues and helps explain the relationship of the parties. Unilda Moffatt owned the property and lived in the house for a number of years. As her physical health began to decline in 2006, Moffatt pitched a deal to Annita Weber, a longtime friend. If Annita and her husband Donald would move into the house to help take care of her, Moffatt would deed the property to them. As part of the arrangement, Moffatt would have a handicap accessible apartment added to the house, where she would live. And the Webers were to convey a much smaller residential property to Moffatt's trust. Everyone agreed, and Moffatt deeded the 20-acre parcel to the Webers.

In 2007, the Webers took out a home equity loan with CNB and mortgaged the Moffatt parcel as collateral. The loan provided a 10-year line of credit up to $75,000 with an annual interest rate of 8.774%. The Webers initially borrowed $20,000 and from time to time later borrowed additional amounts. They made the required periodic payments but did not significantly reduce the principal balance that eventually hovered around $60,000.

2

In the meantime, they never conveyed their residential property to Moffatt's trust, contrary to the agreement. Rather, their son Bill moved into the house and ostensibly was to pay rent to the trust. Moffatt also wrote a check to Annita Weber for $100,000 that was either a loan or a gift.

Moffatt died in September 2010, and Donald Weber died about two months later. In early 2011, Kenneth Walsh, as the administrator of Moffatt's estate, sued Annita Weber and Bill Weber over both the $100,000 check and the failure to deed the residential property to Moffatt's trust. Details of that litigation, which need not be recited here, may be found in *Walsh v. Weber*, No. 113,972, 2016 WL 4750102 (Kan. App. 2016) (unpublished opinion), *rev. denied* October 17, 2017. Annita Weber died in 2013, and her estate was substituted as a defendant in that case. Ultimately, Walsh obtained a $100,000 judgment against Annita Weber's estate based on the check, and the district court imposed a constructive trust on the Webers' property in favor of Moffatt's estate.

Until her death, Annita Weber continued making the required payments on the loan with CNB. As we have indicated, Bill Weber was named the executor of Annita's estate. In that capacity, Bill Weber made only one payment on the loan.

In June 2013, CNB filed this foreclosure action as to the 20-acre parcel and identified the estate of Annita Weber and the estate of Unilda Moffatt as interested parties. (As a judgment creditor of Annita Weber's estate, Unilda Moffatt's estate had a lien that potentially encumbered the parcel.) That pitted Walsh and Bill Weber against each other in this case. They filed various cross-claims that largely mirrored aspects of the legal dispute in *Walsh*. Those claims are not before us on appeal. In this case, Bill Weber unleashed a host of counterclaims against CNB to resist the foreclosure.

The district court held multiple hearings and a short bench trial to sort through the various claims. On June 6, 2016, the district court filed a journal entry of foreclosure. Bill

3

Weber filed a timely notice of appeal. We postpone further discussion of the district court proceedings in favor of more tailored recitations tied to the particular points before us.

ANALYSIS

*Civil Conspiracy Claim*

The district court dismissed Bill Weber's claim that CNB and Walsh had joined in a conspiracy to drive down the amount that might be paid for the 20-acre parcel at the foreclosure sale. The sale, of course, has not yet taken place. The district court ruled correctly because Bill Weber cannot show an actionable injury at this juncture. A civil conspiracy standing alone does not itself constitute a cause of action—the party claiming harm has to prove an independent civil wrong resulting in damages. See *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 926-27, 811 P.2d 1220 (1991); *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984).

The elements of an actionable civil conspiracy have been stated this way:  "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds in the object or cause of action, (4) one or more unlawful overt acts, and (5) damages as the proximate result thereof." *Mays*, 248 Kan. 919, Syl. ¶ 2. The required "overt act" must itself be unlawful and, thus, actionable. And the conspiracy must have produced a compensable injury. In short, a civil conspiracy "is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy." 248 Kan. at 927 (citing *Stoldt*, 234 Kan. at 967). A civil conspiracy basically spreads liability for a civil wrong among the conspirators but is not itself a civil wrong.

Here, the object of the purported conspiracy is the foreclosure sale. But the sale has not occurred, so Bill Weber cannot have suffered any damages as a result of the sale. Moreover, there are statutory and judicial protections when a foreclosure sale yields

4

unusually low bids, whatever the reason. See K.S.A. 60-2415(b) (district court may refuse to confirm sale for "substantially inadequate" bid or may approve sale only if "the fair value of the property" is credited against the amount owed regardless of amount actually bid); *Olathe Bank v. Mann*, 252 Kan. 351, 362-63, 845 P.2d 639 (1993) (fair value of property for purposes of foreclosure sale may be greater than market value).

Unless or until the foreclosure sale results in a depressed price, Bill Weber cannot establish an actionable civil conspiracy, and even then he would have to prove some independent wrongful action bringing about that result. The district court correctly denied Bill Weber's claim as premature.

*Manner and Conditions of Sale*

Bill Weber challenges several district court rulings governing the manner of and terms for the foreclosure sale. Those are matters of the type entrusted to a district court's sound discretion. See *Nesbitt v. Chesebro*, 89 Kan. 863, 869, 133 P. 545 (1913) (whether judicial sale of tract should be as a whole or in parcels rests within district court's discretion) *modified on reh'g* 91 Kan. 14, 136 P. 793 (1913). We have recognized the decision to confirm a foreclosure sale rests within the district court's exercise of judicial discretion. *Citifinancial Mortgage Co. v. Clark*, 39 Kan. App. 2d 149, 151, 177 P.3d 986 (2008). If approving the result of the sale is a matter of judicial discretion, then, *a fortiori*, setting the presale conditions generally must be, as well. A district court exceeds that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

5

The district court denied Bill Weber's requests for three presale appraisals of the property and for a minimum required bid at the sale. Those are discretionary judicial calls. See K.S.A. 60-2415(b) ("The court *may* . . . fix a minimum or upset price at which the property must be bid in if the sale is to be confirmed.") (Emphasis added.) Given the highly contentious tenor of these proceedings and the parallel litigation in *Walsh*, the district court acted soundly and within its legal authority to deny those requests—if only because they would likely spawn additional disagreements and delays. There was nothing particularly unusual about the character of the property that lent material uncertainty to what might be a fair value or price. A peculiar property might warrant presale appraisal or other considerations, although competing appraisals still could be presented to the district court at a confirmation hearing. See *Arbor Lake v. Enterprise Bank & Trust*, No. 109,757, 2014 WL 4723732, at *2-3 (Kan. App. 2014) (unpublished opinion) (At a confirmation hearing following the foreclosure sale, interested parties presented competing appraisals of an incomplete real estate development combining extensive commercial and residential construction.).

As we have mentioned, the district court has tools at its disposal after a sale to correct for a materially depressed winning bid. So the district court's denial of a presale appraisal or a minimum required bid did not strip Bill Weber of protections against a low final sale. There was no abuse of discretion in that ruling.

At Walsh's request and over Bill Weber's objection, the district court authorized a private auctioneer to conduct the sale of the 20-acre parcel and ordered that the fees and costs associated with the auction be paid from the sale proceeds. Bill Weber has appealed that ruling.

On appeal, Bill Weber claims a sale by auction or another private method is contrary to law and the commonly used sheriff's sale. Bill Weber does not directly cite the law he believes a private sale contravenes but mentions K.S.A. 60-2410 governing the

6

sale of land taken on execution. But K.S.A. 60-2410 does not directly apply to judicial foreclosure sales. The statute expressly covers those circumstances in which a judgment lien creditor attaches land of a judgment debtor to satisfy a general judgment for an amount of money. By contrast, a foreclosure sale entails an original action—not a mechanism for collecting an existing judgment—specifically related to a particular parcel of land and results in a judgment limited to that parcel. See *Aguilera v. Corkill*, 201 Kan. 33, 36, 439 P.2d 93 (1968); *First Nat'l Bank & Trust Co. v. Wetzel*, 42 Kan. App. 2d 924, 930, 219 P.3d 819 (2009). In a judicial sale, the district court is treated as the vendor and the person carrying out the sale, be it the sheriff or a private party, acts as the agent of the court. In an execution sale in partial satisfaction of a money judgment, the sheriff is the seller, and he or she acts pursuant to statutory authority, particularly K.S.A. 60-2410. *Aguilera*, 201 Kan. at 36.

The Kansas statutes, thus, draw a distinction between a "general execution" pertaining to the seizure of "any nonexempt property of a judgment debtor" and a "special execution" entailing a judicial order directing "some action with regard to specific property as . . . necessary in adjudicating the rights of the parties to an action." K.S.A. 60-2401(a). The district court's "equity powers" outlined in K.S.A. 60-2415(b) apply to both general executions and special executions.

Bill Weber has pointed us to nothing precluding a district court from directing that an auctioneer, real estate agent, or another comparable private party conduct a judicial foreclosure sale. We have found no statutory limitations, and the caselaw suggests broad judicial discretion in those proceedings. The district court properly directed the foreclosure sale be arranged and conducted by a private auctioneer.

Bill Weber also argues that the likely terms of the sale through the auctioneer are part of the conspiracy between Walsh and CNB to depress the resulting bids for the land.

7

But those arguments are wholly premature for the same reasons as Weber's overall civil conspiracy claim.

But Bill Weber has a legitimate complaint about the district court's assessment of the fees and costs of the private auctioneer against the sale proceeds. That effectively imposes them on Bill Weber, insofar as they will diminish the amount realized from the sale of the land. To the extent the proceeds exceed the unpaid obligation on the loan, the judgment lien, and the expenses of the judicial sale, they become assets of Annita Weber's estate and presumably would pass to Bill Weber. When the parties agree to a private sale and the allocation of the related expenses, the district court may adopt their suggestion assuming it appears objectively reasonable. But a district court oversteps its equitable authority to impose those expenses on an objecting party in advance of the sale. That seems particularly true when the landowner favors a less costly and otherwise acceptable method of a sale. Here, Bill Weber wanted the sheriff to conduct the foreclosure sale. Accordingly, we find the district court erred in ordering the expenses of the private sale to be assessed against the proceeds. Those parties assenting to the private sale should bear the associated costs. We suppose (but do not decide) that a district court could revisit and revise a presale allocation of expenses for a private sale after the sale itself, depending upon the resulting final price.

Bill Weber next complains that the district court improperly shortened the redemption period following the judicial sale from the usual 12-month statutory time to three months, as provided in K.S.A. 2016 Supp. 60-2414. We do not perceive any disputed facts bearing on the ruling. This issue requires construction of the applicable statutory language and, therefore, presents a question of law that we give unlimited review. *State v. Vrabel*, 301 Kan. 797, 802, 347 P.3d 201 (2015).

Redemption rights essentially allow the owner to buy back land following a judicial sale. In K.S.A. 2016 Supp. 60-2414(a), the Legislature provided that the owner

8

typically can do so within 12 months of the sale. But the Legislature has enacted an exception reducing the redemption time to three months if the owner defaults under the terms of the mortgage securing the "most senior lien" and has paid less than one-third of "the original indebtedness" secured by the mortgage. K.S.A. 2016 Supp. 60-2414(m). The exception, however, is itself subject to an exception restoring the 12-month redemption period. When the amount owed on all outstanding mortgages and liens is less than one-third of the property's market value, the owner still gets 12 months to redeem the land after the judicial sale. K.S.A. 2016 Supp. 60-2414(m).

Here, as we indicated, Donald and Annita Weber initially borrowed $20,000 on the home equity loan. Applying the plain language of the statute, that would be the original indebtedness. Bill Weber furnished the district court with a schedule from CNB showing the payments made, additional advances taken, and accrued interest on the loan. At no time did the amount due on the loan ever drop below $20,000—the advances and interest outstripped the payments. So, the original indebtedness was never paid down by one-third.

And Bill Weber could not show the exception to the shortened redemption time in K.S.A. 2016 Supp. 60-2414(m) applied. The principal owed on the home equity loan was about $60,000. The 20-acre parcel was then subject to a $100,000 lien as a result of the judgment entered against Annita Weber's estate in *Walsh*. Those encumbrances totaled about $160,000. The district court received estimates of the parcel's worth ranging from $160,000 to about $297,000. The combined amounts of the judgment lien and the balance due on the loan easily exceeded one-third of the market value. The district court, therefore, properly set a three-month redemption period.

9

*Usury Claim*

Bill Weber contends the home-equity loan CNB provided to Donald and Annita Weber imposed an unlawful or usurious interest rate. The district court rejected the claim, and Bill Weber has appealed that decision. The parties engage in an extended battle over whether a usury claim can be brought in a foreclosure action and the legal effect it might have here. They also fight over whether the claim is time barred. But the expiration of a statutory limitations period is an affirmative defense that CNB may not have pleaded sufficiently. See *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 462, 276 P.3d 773 (2012). We put all of that skirmishing to one side because Bill Weber has failed to show the loan was usurious, and his claim fails for that reason. In taking that approach, we functionally examine the best case Bill Weber has presented.

But we do take up one preliminary contention: CNB has questioned Bill Weber's standing to pursue the usury claim given the real possibility no equity remains in the 20-acre parcel in light of the outstanding loan balance, the costs and fees associated with this action, and Walsh's judgment lien. The district court rejected CNB's argument, and the bank has not cross-appealed. Typically, a party's failure to cross-appeal from an adverse district court ruling would bar appellate review. See *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 191-92, 106 P.3d 483 (2005). But the Kansas Supreme Court has treated standing as a component of subject matter jurisdiction. *Ternes v. Galichia*, 297 Kan. 918, 921, 305 P.3d 617 (2013). Defects in subject matter jurisdiction cannot be waived and may be asserted at any time. 297 Kan. at 921.

Bill Weber has extant legal interests in the 20-acre parcel both as the executor of Annita Weber's estate, which remains the owner of the land, and as an heir of the estate and, thus, in its assets. Although this case may ultimately extinguish those interests or render them worthless, a potential (or even likely) adverse result in the litigation cannot

deprive Bill Weber of the opportunity to protect those interests. As the district court correctly ruled, Bill Weber has standing.

Bill Weber's substantive usury argument requires us to review interlocking federal and state statutes establishing or limiting lawful interest rates and various exceptions to those provisions. The district court held an evidentiary hearing on the usury claim—functionally, a bench trial—at which Bill Weber testified. We see no conflicts in the evidence bearing on this claim. The issue turns on the application of undisputed facts to relevant statutory language, furnishing us with a question of law. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011).

As the party asserting usury, Bill Weber bore the burden of proof in the district court. See *In re Estate of Johnston*, 180 Kan. 329, 332, 304 P.2d 461 (1956); *Indian Springs State Bank v. Kelley's Auto Supply, Inc.*, 9 Kan. App. 2d 211, 213, 675 P.2d 379 (1984). We begin where Bill Weber does—with 12 U.S.C. § 85 and § 86 (2012), regulating interest rates national banks may use. Under 12 U.S.C. § 85, the regulated banks, including CNB, may charge interest at the higher of a rate tied to the regional Federal Reserve Bank's discount rate on 90-day commercial paper or the rate allowed by state law in the state where the bank is located. Bill Weber asserts the 8.774% interest rate on the home equity loan exceeded the applicable Federal Reserve rate; we accept the assertion simply for purposes of resolving the issue. That takes Bill Weber (and us) to K.S.A. 2016 Supp. 16-207, governing interest rates in notes and other commercial instruments, as the source of the alternative state rate permitted by 12 U.S.C. § 85.

In K.S.A. 2016 Supp. 16-207(a), the Legislature generally capped interest rates on notes and other instruments at 15% but permitted specific exceptions. Bill Weber contends the interest rate violated an exception in what was K.S.A. 16-207(b) when Donald and Annita Weber entered into the loan with CNB in 2007. That subsection established an interest rate for "first mortgage loans" 1 1/2% higher than rates set

11

monthly by the federal home loan mortgage corporation. Bill Weber offered a summary exhibit indicating the loan rate exceeded the rate applicable through K.S.A. 16-207(b). Again, we suppose that to be correct for purposes of resolving the issue.

The Legislature repealed the provision on which Bill Weber premises his argument in 2013, approaching three years before the district court decided the usury issue. The parties have not directly addressed the legal effect of the repeal, if any. Given our resolution of the point, we need not.

In the pre-2013 version of K.S.A. 16-207, subsection (f) provided that the interest rates set out in subsections (a) and (b) did not apply to "a business or agricultural loan," which, in turn, was considered any loan other than one "made primarily for personal, family or household purposes." Courts typically determine the purpose of a loan based on the borrower's use of the proceeds rather than the character of any collateral. See *Decision Point, Inc. v. Reece & Nichols Realtors, Inc.*, 282 Kan. 381, 387, 144 P.3d 706 (2006) (looking at use of borrowed money to determine if loan covered by Uniform Consumer Credit Code); *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988); *Toy Nat. Bank of Sioux City v. McGarr*, 286 N.W.2d 376, 378 (Iowa 1979); *Drew v. Ocwen Loan Servicing, LLC*, No. 8:14-cv-369-T-26TGW, 2015 WL 5637569, at *2 (M.D. Fla. 2015). During the evidentiary hearing or bench trial, Bill Weber testified that Donald and Annita Weber used the initial loan amount of $20,000 for what would be considered household purposes—they paid off a loan against their previous residence that had been used to finance renovations to the house on the 20-acre parcel. But Bill Weber offered no evidence as to how the balance of the loan, some $43,000, had been spent. Accordingly, Bill Weber failed to prove the loan to Donald and Annita Weber was "primarily" for personal, family, or household purposes. In turn, the loan had to be classified as one for business or agricultural purposes, meaning any interest rate set by K.S.A. 16-207(b) would have been inapplicable.

12

Bill Weber has offered neither an alternative legal theory nor additional authority to show the CNB loan was otherwise usurious. The district court, therefore, reached the correct conclusion in rejecting the usury claim in this foreclosure action.

*Loan Defaults*

On appeal, Bill Weber contends the circumstances triggering default of the home equity loan—the death of Annita Weber and the lack of payments following her death— should be excused. As a result, he says the line of credit should have remained open until 2017, when it expired under the terms of the loan agreement. CNB's foreclosure action would have been improper for that reason. We find the premise faulty and the argument unsound.

The home equity loan reflected a contract between Donald and Annita Weber, on the one hand, and CNB, on the other. The contract provided that the deaths of the Webers, as the contracting parties, would amount to a default and would allow CNB to treat any outstanding balance as immediately due. Bill Weber doesn't dispute the existence of the contractual default condition or suggest its language is ambiguous or somehow facially inapplicable here. Rather, Bill Weber seems to argue that making the death of the borrower a form of default in a loan contract is inherently unfair and, therefore, must be unenforceable. He never really explains the inherent unfairness and cites no supporting authority for his proposition.

As a general rule, parties may freely contract, and the courts will enforce the terms of those bargains unless they contravene public policy. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 39, 59 P.3d 1003 (2002) (contracts contravening public policy are unenforceable); *Simpson v. City of Topeka*, 53 Kan. App. 2d 61, 83, 383 P.3d 165 (2016) (Atcheson, J., concurring) (court's duty to enforce unambiguous contracts as written); *Lauck Oil Co. v. Breitenbach*, 20 Kan. App. 2d 877, 879, 893 P.2d 286 (1995) (same).

13

Bill Weber doesn't explain how a default-on-death clause in a loan agreement violates public policy. No explanation immediately occurs to us. Conversely, Kansas recognizes a strong public policy in promptly settling the estate of a person who has died, so that legitimate creditors may be paid and the remaining assets distributed to heirs in keeping with the deceased's wishes as expressed in a will or by intestate succession. *In re Estate of Rickabaugh*, 51 Kan. App. 2d 902, 914, 358 P.3d 859 (2015), *aff'd* 305 Kan. 921, 390 P.3d 19 (2017). If we took up Bill Weber's suggestion, estates would remain open to continue paying on installment loans, potentially for years, impeding the settlement of debts and a final distribution of assets.

We decline Bill Weber's unexplained and seemingly novel invitation to tamper with settled principles of contract and probate law. In short, Annita Weber's death constituted a default under the terms of the loan. That alone permitted CNB to declare a default, accelerate the amount due, and seek relief through foreclosure when the debt remained unpaid.

In the interest of completeness, we address Bill Weber's argument as to why nonpayment on the loan should be excused as a default. He points out payments reducing the principal due on the loan increased the equity in the 20-acre parcel that had been pledged as collateral for the loan. In turn, the action Walsh filed as the administrator of Moffatt's estate against the estate of Annita Weber might (and ultimately did) result in a judgment lien that could be enforced against the 20-acre parcel. So, Bill Weber contends, any payments he made on the loan as the executor of Annita Weber's estate potentially would have inured to the benefit of Moffatt's estate and, thus, to the detriment of Annita Weber's heirs. While all of that is true, we fail to see how those circumstances excuse the performance of an otherwise legal contractual obligation imposed on Annita Weber to make payments on the loan—an obligation that devolved to her estate after her death.

14

Bill Weber tries to bolster this part of his argument about default by suggesting CNB and Walsh acted in tandem when they respectively foreclosed on the loan and filed suit against Annita Weber's estate. This draws on the themes underlying the civil conspiracy claim. But, here, we have CNB undertaking a lawful action in declaring the loan in default and seeking payment and Walsh filing a separate action based on a colorable (and eventually successful) claim against Annita Weber's estate. Even if that conduct were coordinated, we don't particularly see how the combination of those two otherwise lawful acts turns into an unlawful one and, in particular, one that would void the payment obligation in the home equity loan.

In short, CNB properly declared the loan in default.

*Attorney Fee Award*

In its journal entry ordering foreclosure, the district court awarded CNB $67,224.50 in attorney fees but specifically reserved any judicial determination of the reasonableness of the amount for a later ruling. The award was based on a provision in the home equity loan agreement. Bill Weber has challenged the award.

Courts often treat contractual and statutory awards of attorney fees as ancillary to any judgment on the merits of a legal dispute. Accordingly, district courts may retain jurisdiction to award attorney fees even after a judgment on the merits has been appealed. And, likewise, the pendency of a request for a statutory or contractual award of attorney fees typically does not prevent a merits judgment from becoming a final, appealable order. See *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 246 Kan. 371, Syl. ¶¶ 1-3, 789 P.2d 211 (1990).

But the district court's determination of the reasonableness of an attorney fee request constitutes a necessary component of a final order awarding fees. In other words,

15

the district court cannot enter an enforceable order on attorney fees without having ruled on their reasonableness. See *Davis v. Winning Streak Sports*, 48 Kan. App. 2d 677, 684, 301 P.3d 709 (2013); *Wittig v. Westar Energy, Inc.*, 44 Kan. App. 2d 216, 232-33, 235 P.3d 535 (2010). Here, the district court's decision on the amount of attorney fees remains interlocutory without a determination of reasonableness. As such, the district court may review and revise the amount in addition to making a finding on reasonableness. We, therefore, do not have before us a final appealable order on attorney fees. In turn, we express no opinion on any aspect of the issue. See K.S.A. 60-2101(a). Bill Weber's appeal on this point is premature and is, therefore, dismissed. Our ruling, of course, does not preclude Bill Weber from asking the district court to reexamine any aspect of CNB's attorney fee request when the district court takes up the reasonableness of the award.

*Conclusion*

We affirm the district court's rulings:

• Dismissing Bill Weber's civil conspiracy claim as premature;

• Rejecting Bill Weber's requests for an appraisal of the 20-acre parcel before the judicial sale and for a minimum bid at the sale and approving a sale by private auction with a three-month redemption period;

• Denying Bill Weber's usury claim; and

• Denying Bill Weber's request to excuse the defaults on the loan.

We reverse the district court's order assessing the costs associated with private auction against the foreclosure sale proceeds. We dismiss Bill Weber's challenge to any award of

16

attorney fees to CNB because the district court has not yet entered a final appealable order. The case is remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, dismissed in part, and remanded for further proceedings.